**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| R. DAVID BOYER, TRUSTEE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:05-CV-129-TLS |
| | ) | |
| CHRISTOPHER GILDEA et. al, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION**

This matter is before the Court on the Defendants' motions for summary judgment, filed on May 12, 2006. The Plaintiff, bankruptcy trustee David Boyer, filed a Complaint consisting of five claims that arose out of the bankruptcy of GT Automation, Inc. The Defendants filed for summary judgment on all claims, and for the reasons stated below, the Court denies summary judgment on the Plaintiff's first claim, withholds ruling on the second, and grants summary judgment on the third, fourth, and fifth claims.

**A.      Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). After adequate time for discovery, summary judgment must be given against a party "who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial."

Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Only material facts will preclude summary judgment; irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Anderson*, 477 U.S. at 248–49. If there is no genuine issue of material fact, the only question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wisc. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

### B.  Factual Overview and Procedural Background

This case arose out of the bankruptcy of GT Automation Inc. ("Debtor"). Steven Gildea was the president of the Debtor and sole equity owner. Defendant Anita Gildea is Steven Gildea's wife. Steven and Anita Gildea were the sole directors of the Debtor. Steven and Anita Gildea were also

sole directors of Defendant Gildea & Gorman, LLC (G&G). The Debtor operated in a building it leased from G&G pursuant to a written lease agreement entered into about June 23, 1998. Defendant Chris Gildea, Steve Gildea's son, was an officer of the Debtor. Chris Gildea also owned Defendant Gasson, LLC. Gasson leased equipment to the Debtor. Defendant Katherine Gildea is Chris Gildea's spouse.

The Debtor filed for bankruptcy on October 9, 2001, and bankruptcy court allowed the Debtor to continue operating as a debtor-in-possession. Comerica was the Debtor's largest secured creditor and held a first priority security interest and lien on all of its assets. Comerica filed a proof of claim in the bankruptcy proceedings for $7,818,406.10.

In February 2003, the Debtor moved for an order authorizing an auction of the Debtor's assets. Included in the motion was an offer by Anita Gildea, Chris Gildea, and two employees of the Debtor to purchase the Debtor's assets for $1,400,000. The creditors objected to the offer. The bankruptcy court issued an order allowing an auction of the Debtor's assets pursuant to 11 U.S.C. § 363, subject to conditions agreed to by the debtor and objecting creditors.

The auction for the Debtor's assets was held on April 3, 2003. Defendant GTA Acquisition LLC submitted a bid of $2,725,000, which was the highest bid. GTA Acquisition was an entity created by Defendant Arlington Capital on about April 1, 2003, for the purpose of acquiring the Debtor's assets. Arlington also formed GTA Realty, LLC, for the purpose of taking title to the real property. On April 7, 2003, the bankruptcy court approved the sale of the Debtor's assets to GTA Acquisition. On April 16, 2003, an amended sale order was submitted and approved. There were no objections to the sale.

On April 7, 2003, GTA Acquisition was acquired by Defendant GT Enterprises, LLC,

(GT/E). GT/E was formed and is owned by Katherine Gildea, Mike Motter, and Matt Mercer. Matt Mercer was a Vice President of the Debtor. Mike Motter was the Debtor's accountant.

This case was filed on April 7, 2004. The Plaintiff's Complaint states claims against Christopher Gildea, Katherine Gildea, Michael Motter, Matt Mercer, Anita Gildea, Arlington Capital, LLC, GT Acquisition LLC, GT Enterprises, LLC, Gasson, LLC, and Gildea & Gorman, LLC. An amended complaint was filed on October 18, 2004. The Amended Complaint lists eight counts. The Court granted summary judgment on the Plaintiff's state law claims against Arlington Capital (Counts VI to VIII of the Amended Complaint) on October 17, 2005. The first of the five remaining claims is to avoid the unauthorized transfer of a $170,000 account receivable from the Debtor to Chris Gildea. The second is to avoid more than $30,000 in reimbursements made by the Debtor to Chris Gildea. The third is to avoid the transfer of $83,000 from the Debtor to G&G. The fourth is a claim for breach of fiduciary duty against Mike Motter and Chris Gildea. The fifth claim is for statutory damages under 11 U.S.C. § 363(n) against Arlington Capital, GT/E, Chris Gildea, Katherine Gildea, Mike Motter, and Matt Mercer.

On May 12, 2006, the Defendants submitted five separate motions seeking summary judgment on each of these five counts. On June 12, 2006, the Plaintiff filed its Response to the five motions, and on June 27, 2006, the Defendants filed their Replies along with two motions to strike as inadmissible evidence submitted with the Plaintiff's Response. On June 30, 2006, the Plaintiff filed two motions to strike evidence submitted by Gildea, and a motion to strike one of Gildea's replies because it exceeded the maximum length allowed for a reply brief. Finally, on July 13, 2006, the Plaintiff asked that should Gildea's motions to strike be granted, more time be allowed the Plaintiff to conduct discovery of admissible evidence.

5

**C.     Count I**

As allowed by 11 U.S.C. § 549, Count I of the Plaintiff's Complaint seeks to avoid the transfer of a $170,000 account receivable from the Debtor to Chris Gildea. Gildea denies that any such transfer took place and that the account receivable was sold in the auction as an asset of the Debtor. Whether the Debtor transferred the account receivable to Chris Gildea is the only issue in this claim.

**1.     *Facts relevant to Count I***

At the time the Debtor filed for bankruptcy, the Debtor owned an account receivable of $170,000, Gasson, LLC owing to it. Gasson was a company owned by Chris Gildea. The Accounts Receivable Aged Invoice Report that was filed with the bankruptcy court on December 31, 2001, lists the account receivable as outstanding as of December 16, 2001.

Chris Gildea states that at all times up to the sale of the Debtor's assets the account receivable remained due and owing. In support of his assertion, Gildea submitted the affidavit of Thomas Norris, who prepared the financial reports for the Debtor from the date bankruptcy was filed up through March 2003. The financial reports were given to the Debtor's primary lender, Comerica, as well as the bankruptcy trustee. Among these reports were listings of the Debtor's accounts receivable, and these listings always included the Gasson receivable. The Weekly Cash Collateral Report for the week ending of March 7, 2003, lists the $170,000 Gasson account receivable as outstanding. (Aff. Thomas Norris, Ex. A 14, DE 85.) Norris states that the financial books and records show no setoff of the account receivable owing by Gasson for unpaid wages to Chris Gildea.

6

The Plaintiff submitted evidence that the account receivable was transferred from the Debtor to Gildea to offset the amount the Debtor owed to Chris Gildea for unpaid wages. In the summer of 2002, during reorganization negotiations between a group associated with Steve Gildea and the Debtor's creditors, Mike Motter submitted an Amended Plan Offer, which would have allowed Steven Gildea and associated parties to retain control over the Debtor. The e-mail attached to the Amended Plan Offer is dated July 24, 2002. An attachment to the Amended Plan Offer addressed the Debtor's doubtful or uncollectible accounts, including the Gasson account receivable. The attachment stated, "After discussing the matter with Steve Gildea and Thomas Norris, it was agreed that the outstanding balance should be exchanged for a waiver of both wages due Chris Gildea and monies owed to Gasson LLC . . . ." (Werling Aff. ¶ 9, Ex. A at 6, DE 82-2.) This was testified to by Mark Werling, an attorney who represented Comerica in the negotiations.

The Plaintiff also submitted a property schedule that was  filed with the bankruptcy court on December 5, 2001. The schedule lists the $170,000 Gasson, LLC, account receivable, but states that the $170,000 would be adjusted and written off. (Boyer Decl. 2, Ex. C at GTAUTO 40, 57, DE 77-3.)

The Plaintiff points to financial statements Chris Gildea provided to First Federal Bank of Huntington and to Community Development Corporation of Northeast Indiana when he was seeking financing to purchase the Debtor's assets. According to Rozyln Rader, who worked for the Community Development Corporation, the documents submitted by Gildea list accounts receivable as of November 20, 2002, and do not show the Gasson receivable as outstanding. According to James Conner, who worked for the Huntington bank, the documents Gildea submitted list accounts receivable as of December 31, 2002, and also do not show the Gasson receivable as outstanding.

The Plaintiff also states the bid submitted by GT Acquisition in April 2003, which does not list the Gasson receivable in its schedule of accounts receivable as of March 31, 2003, refutes Gildea's assertion that the auction sale included the Gasson receivable. (Appendix of Documents Supporting Defendant's Motion for Summary Judgment on Counts III and V, Ex. 7 of Nicholson Aff., Exhibit M, at 19–20, DE 70.)

Finally, the Plaintiff argues that the absence of any claim by Chris Gildea for his unpaid wages supports their assertion that his wages were set off against the Gasson receivable.

**2.**     ***Defendant Chris Gildea's Motion to Strike***

Chris Gildea has moved to strike portions of the Plaintiff's declaration and portions of the affidavits of Mark Werling, Rozlyn Rader, and James Connor because the documents are unauthenticated and hearsay. Gildea challenges the Plaintiff's declaration and the property schedules filed by the Debtor with the bankruptcy court. He also challenges the portion of Mark Werling's affidavit dealing with the attachments to the 2002 Amended Plan Offer. Finally, the  challenged submissions of Rader and Conner are the reports of the Debtor's accounts receivable.

The Plaintiff claims the evidence is admissible, but has not offered any convincing arguments to support the claim. The Plaintiff does not attempt to identify the authors of any of the challenged documents. Also, the Plaintiff's hearsay arguments are incomplete. For example, the Plaintiff argues that some of the documents are admissible as admissions against interest, but he does not attempt to show that the declarant is unavailable. Fed. R. Evid. 804. He claims that Debtor's documents are admissible because the books and records of the Debtor are the property of the bankruptcy estate, but does not say how that remedies the hearsay issues.

The Plaintiff also argues that ruling on the motions to strike would be premature because he has not had adequate time to conduct all necessary depositions. The Court agrees with the Plaintiff that it would be premature to strike the challenged documents and rule on the motions for summary judgment. For the sake of efficiency and because it appears that the Plaintiff's evidence may prove admissible after further discovery, the Court will consider all of the Plaintiff's evidence in deciding Gildea's motion for summary judgment. After the Plaintiff has completed his discovery, if it appears that the challenged documents are not admissible, Gildea may move to strike the documents and ask for reconsideration of the Court's resolution of his motion.

**3.**     *Plaintiff's Motion to Strike*

The Plaintiff seeks to strike the affidavit of Thomas Norris because it was filed with Chris Gildea's Reply, and included evidence not contained in Gildea's first submission. Gildea filed no response. In light of the Court's decision to consider the evidence submitted by the Plaintiff despite the Plaintiff's failure to demonstrate its admissibility, and as a matter of efficiency, the Court will consider Gildea's evidence. However, as stated below, even considering Gildea's evidence, the Court finds that he not shown that there is no material issue of fact as to whether the transfer took place.

**4.**     *Analysis*

Title 11 U.S.C. § 549 allows a bankruptcy trustee to avoid a transfer of property of the bankruptcy estate if the following elements are met: 1) there is a transfer of property; 2) the property transferred is that of the bankruptcy estate; 3) the transfer was made after the commencement of the

case; and 4) the transfer was not authorized by the Bankruptcy Code or by the bankruptcy court. *In re Blair*, 330 B.R. 206, 213 (Bankr. N.D. Ill. 2005). Transfer is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." 11 U.S.C. 101(54). "Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof." Fed. R. Bankr. P. 6001.

At issue is whether the Debtor actually transferred property to Chris Gildea. The burden is on Chris Gildea, not the Plaintiff, to prove the validity or existence of the transfer. There is a material issue of fact as to whether such a transfer took place. A reasonable jury could find from the Plaintiffs's evidence that the Debtor transferred the account receivable to Chris Gildea as payment for back wages. While Gildea has some documents stating the Gasson receivable remained outstanding, other documents do not include the Gasson receivable. The December 5, 2001, filing and the Amended Plan Offer attachments both show that the Debtor intended to write off the Gasson receivable. The Amended Plan Offer attachment states it would be offset against Chris Gildea's outstanding wages. The Gasson receivable was not included in the bid to acquire the Debtor's assets, and was not included in the financial documents filed with the Huntington bank or the Community Development Corporation. Gildea never sought his back wages that were owed, suggesting the offset had taken place. Gildea has not carried his burden to submit evidence sufficient so that a reasonable jury could only find that no transfer occurred. Therefore, a material issue of fact exists on the question for a jury to answer.

For these reasons, Defendant Chris Gildea's motion for summary judgment must be denied.

**D.     Count II**

Pursuant to 11 U.S.C. § 549, Count II of the Plaintiff's Complaint seeks to avoid more than $30,000 of the Debtor's payments to Chris Gildea made to reimburse Gildea for payments he made for what he claims were ordinary business expenses of the Debtor. At issue is whether the payments were in fact ordinary business expenses.

**1.     *Facts Relevant to Count II***

Chris Gildea states that he used his credit card to charge and pay for necessary expenses of the Debtor during the normal course of the Debtor's business, and that these expenses were routinely reimbursed by the Debtor. Gildea states these reimbursements were fully disclosed in the Debtor's operating reports or bank statements, and were of the same type of expense the Debtor routinely reimbursed for other employees. Gildea submitted the affidavit of Thomas Norris, which states that the type of reimbursement challenged by the Plaintiff was routinely given to the Debtor's employees in the ordinary course of its business, and that the Debtor's records show no change in the amounts of such reimbursements after the Debtor petitioned for bankruptcy.

The business records submitted with Norris's affidavit show reimbursements made by the Debtor from May 1998 to October 2001, the three years before the Debtor filed for bankruptcy, and from October 2001 to April 2003, the year and a half following the bankruptcy filing.  During the first period, Chris Gildea received $37,265.04 in reimbursements, and in the second period, he received $34,057.84 in reimbursements. The total amount of reimbursements paid by the Debtor in the first period was $145,477.25, and the total in the second period was $69,279.55. Norris states that the expenditures listed in the documents were for "expenses of the Debtor that were ordinary

in nature and type." (Norris Aff. 2, DE 87.)

The Plaintiff submitted the affidavit of Mark Werling, who represented Comerica, which states that Werling received from the Debtor disbursement ledgers showing reimbursements of over $30,000 for expenses paid for by Gildea. Werling also states that he was told by Mike Motter in an e-mail that Gildea's credit card was used when the Debtor did not have otherwise available funds. The Plaintiff asserts that there are no advances for emergency purposes in the Debtor's ledger for the pre-petition period.

### 2.     *Motions to Strike*

Chris Gildea moved to strike paragraph 77 of Mark Werling's affidavit and the supporting document. Gildea argues that the supporting document is not authenticated as required by Federal Rule of Evidence 901, and that Werling's statements are inadmissible hearsay because Werling repeats statements made to him by Mark Motter and no hearsay exception applies. For the same reasons as those previously stated, the Court will consider the challenged evidence.

The Plaintiff's motion to strike the affidavit of Thomas Norris is likewise denied, as considering all the evidence at this stage appears to be the most efficient course of action. However, because the Plaintiff has not been given the opportunity to respond to the evidence submitted with Gildea's Reply, the Plaintiff is given fifteen days to file a surresponse to Gildea's motion for summary judgment on Count II.

### E.     Count III

Count III of the Plaintiff's Complaint seeks to avoid $83,000 of payments made by the

12

Debtor to G&G pursuant to § 549, and alleges that those to whom G&G transferred the money are liable under 11 U.S.C. § 550. Included as Defendants in this claim are Anita Gildea, Chris Gildea, Katherine Gildea, Mike Motter, and Arlington Capital.

**1.** *Facts Relevant to Count III*

The Debtor leased space from G&G pursuant to a written agreement entered on June 23, 1998, for $17,000 a month. G&G was owned by Steven and Anita Gildea. The Debtor's filings with the bankruptcy court disclosed the Debtor's rent payments to G&G after the Debtor filed bankruptcy. The rent payments were listed as general expenses and specially noted as payments to an insider. No objection was made to such payments. There is no evidence of any other payment by the Debtor to G&G other than the rent payments.

The Plaintiff states that the Debtor paid $83,000 to Steven Gildea's personal account, but the evidence relied on by the Plaintiff does not support this allegation. There is no evidence of a transfer of money from the Debtor to the Gildeas. What the evidence shows is that G&G had money funds from the Debtor's rent payments, and that Steven Gildea transferred $83,000 from G&G to his personal account.

The account of the transfer from G&G to Steven Gildea is muddled and inconsistent. Steven Gildea testified about his transactions with G&G as suggesting some impropriety. On November 12, 2003, Gildea's attorney wrote to explain a transaction, stating $83,148 of G&G's funds was inadvertently deposited in Gildea's personal account. (Boyer Decl., Ex. W, Letter from David Krebs to Mark Werling, DE 83-17.) The letter states that the money was ultimately paid to GT Acquisition as a partial payment of the $565,800 G&G owed to the Debtor. The money was paid to GT

Acquisition because GT Acquisition purchased the Debtor's assets, including the $565,800 account receivable.

Two days later, on November 14, 2003, at a deposition for his personal bankruptcy, Steven Gildea explained that G&G owned real estate and rented the property to the Debtor. (Boyer Decl., Ex. P, S. Gildea Dep. 83–91, DE 77-24.) G&G made mortgage payments on the property to Comerica. In anticipation of the next mortgage payment, G&G had money in its account. However, before the next mortgage payment came due, G&G sold the property to Arlington. After the sale, G&G had about $80,000 on hand. According to Steven Gildea, his wife inadvertently wrote checks transferring the $80,000 from G&G's Wells Fargo account to Steven Gildea's personal account with National City Bank.

Steven Gildea added to the story about the $80,000 at a hearing on December 10, 2003. (Boyer Decl., Ex. Q, S. Gildea 341 Meeting, 4–6, DE 77-25.) Steven Gildea said that he wrote two checks to his son Chris Gildea totaling $83,148. Gildea stated the transfers were a loan from G&G to Chris Gildea. The loan originated in March 2003 and was paid back with interest in June 2003. Gildea stated he was not certain about the purpose of the loan, but he thought it had to do with Chris Gildea's negotiations with Arlington to buy the Debtor's assets. Steven Gildea stated the money he loaned to his son was transferred to his account from G&G, and that G&G received the money as rent from the Debtor.

On April 22, 2004, Steven Gildea testified about the transaction again, substantially changing the account he gave earlier. (Boyer Decl., Ex. R, S. Gildea Dep. 36–41, DE 77-27.) Gildea did not state that the transfer of money from the G&G account to his personal account was inadvertent, but that it was put there purposely. Gildea said he was concerned that Comerica might not make funds

14

available to the Debtor in time to make payroll and wanted to use the G&G money to cover payroll if it was necessary. The intent behind the transfer was that the money could be more quickly transferred to pay the Debtor's employees if it was in a National City Bank account. The Debtor's accounts were with National City Bank, and there was no wait time to transfer money from one National City Bank account to another, while transferring money from G&G's Wells Fargo account to the Debtor's National City Bank account could take a few days. It never became necessary to use the money to cover payroll, however.

The Plaintiff submitted bank statements from Steven Gildea's National City Bank account. The statements show arrows pointing to certain transactions. There is no explanation of what the arrows were intended to show. Two checks written that total $83,148 are pointed to, apparently the checks written to Steven Gildea's son Chris. Two deposits are pointed to, one for $28,000 and another for $20,000, but it is not clear what the source of these deposits were, as the statement does not show the source of any deposit. (Boyer Decl., Ex. V, DE 83.)

**2.      *Plaintiff's Motion to Strike***

The Plaintiff seeks to strike paragraphs four and six of Steven Gildea's affidavit, arguing that they contradict his previous statements under oath at earlier hearings. In paragraph four, Gildea states: "During the bankruptcy, the Debtor paid rent to Gildea & Gorman." (Steven Gildea's Aff. ¶ 4, Ex. O, Appendix Mot. Summary Judgment, DE 70-62.) In paragraph six, he states that the rent the Debtor paid to G&G was disclosed. The Court sees no inconsistency between these statements and his other statements, though Gildea's testimony certainly contains other non-material inconsistencies. The Plaintiff's motion to strike is denied.

3.      *Analysis*

Count III seeks to avoid a $83,000 transfer from the Debtor to Steven Gildea under § 549. Section 549 allows a bankruptcy trustee to avoid a transfer of property of the bankruptcy estate if the following elements are met: 1) there is a transfer of property; 2) the property transferred is that of the bankruptcy estate; 3) the transfer was made after the commencement of the case; and 4) the transfer was not authorized by the Bankruptcy Code or by the bankruptcy court. *In re Blair*, 330 B.R. at 213. If a business is allowed to continue operating after filing for bankruptcy, it may continue to obtain unsecured debt and enter transactions if the business does so in the course of ordinary operations. 11 U.S.C. § § 363(c)(1); 364(a).

The bankruptcy code does not define "ordinary course of business," but courts have fashioned a test to determine whether a transaction was in the ordinary course of business. A transaction is in the ordinary course of business if it "most likely" is the case that the "transaction at issue [does not] subject a hypothetical creditor to economic risks different from those accepted when such creditor initially extended credit to the debtor," and that the transaction at issue is comparable to the types of transactions entered into by similar businesses. *Matter of Garofalo's Finer Foods, Inc.*, 186 B.R. 414, 424 (N.D. Ill. 1995) (quoting *In re Garofalo's Finer Foods, Inc.*, 164 B.R. 955, 962–63 (Bankr. N.D. Ill. 1994)). A creditor's reasonable expectations are "based in large part upon the debtor's specific pre-petition business practices and norms and the expectation that the debtor will conform to those practices and norms while operating as a debtor-in-possession," and therefore, a "fundamental characteristic of an 'ordinary' post-petition business transaction is its similarity to a pre-petition business practice." *Id.* at 425.

Here, the Plaintiff has no evidence that would allow a reasonable jury to find that money the

Debtor paid to G&G for rent was not in the course of ordinary operations. Also, whatever G&G did with the money is not relevant, as there is nothing to suggest that G&G's funds should be considered property of the bankruptcy estate. The Plaintiff makes no argument to the contrary. Rather, all of the Plaintiff's arguments and evidence relate to the propriety of transfers of G&G's funds, not the Debtor's funds. The Plaintiff states that the Debtor transferred $83,000 to Steven Gildea's personal bank account. (Pl. Br. 7, DE 75 ("[Gildea] offered several explanations for the unusual size of the $83,000 Transfer and why it was paid by the Debtor directly into [Gildea's] bank account rather than the account of G&G, the Debtor's landlord.").) Nothing supports this assertion. In fact, the Plaintiff's own evidence shows the money was transferred from G&G's account to Gildea's account.

If this were not confusing enough, the Plaintiff spends much of its brief discussing a separate payment of $25,000 from Steven Gildea to his daughter-in-law Katherine Gildea. The relevance of this transaction is a mystery, as it appears to bear no relationship to the propriety of the Debtor's rental payments to G&G.

The Defendants' evidence shows the rent payments were made in accordance with the 1998 lease. Because the Plaintiff has no argument or evidence suggesting that payments by the Debtor to G&G were not ordinary business expenses, and because the bankruptcy filings clearly disclosed the rental payments made by the Debtor to G&G, the Court finds that a reasonable jury could only conclude that the Debtor's rental payments to G&G were ordinary business expenses. The Defendants have carried their burden in showing the payments were authorized. There being no basis to set aside any transaction between G&G and the Debtor, the Defendants' motion for summary judgment is granted and the Plaintiff's Count III is dismissed.

F.      **Counts IV and V**

Count IV alleges that, because they were employed by the Debtor, Chris Gildea and Mike

Motter had a fiduciary obligation to disclose their negotiations with Arlington to obtain an interest

in the Debtor and that they fraudulently concealed their negotiations. Count V claims that Arlington

Capital, GTA Acquisition, GT/E, Chris Gildea, Katherine Gildea, Michael Motter, and Matthew

Mercer were potential bidders who entered an agreement controlling the price of the assets sold  at

the § 363 auction sale in violation of § 363(n).

1.      *Facts Relevant to Counts IV and V*

On February 12, 2003, the Debtor filed a motion seeking authorization of an auction of the

Debtor's assets pursuant to § 363(b) and (f). Included in the motion was an offer to buy the Debtor's

assets from G&G and an entity named GT Acquisition, which consisted of Chris Gildea and Anita

Gildea, along with the Debtor's employees Matt Mercer and Joseph Siela. The offer was that G&G

would purchase the Debtor's real estate for $607,329.92, and the GT Acquisition would buy the rest

of the Debtor's assets for $600,000. The Committee of Unsecured Creditors objected. A hearing was

held on the motion on March 5, 2003. On March 13, 2003, the bankruptcy court issued an order

allowing an auction of the Debtor's assets, subject to conditions agreed to by the Debtor and the

objecting creditors. Bids were to be submitted by April 2, 2003, and were to be in the form of an

agreement of a binding offer to purchase the Debtor's assets. Bids were required to fully disclose

the identity of the entities that would acquire a portion of the Debtor's assets in connection with the

bid.

On February 26, 2003, Comerica discussed with Chris Gildea a proposal to finance an offer

of $3.7 million. On March 3, 2003, Comerica sent term sheets to a buyout group consisting of Gildea, Motter, and Mercer, regarding a proposed acquisition for about $3.7 million. Gildea stated he was not interested in dealing with Comerica because he did not trust them to treat the company fairly.

Around March 5, 2003, Arlington Capital began negotiating with Comerica over the price at which Comerica would consent to a sale of the Debtor's assets. Arlington was interested in buying the Debtor as a going concern with its current management in place, which included employees who were also interested in owning the company. Negotiations continued throughout March. Arlington increased its initial offer from about $1.4 million to $2.7 million and on April 2, 2003, Comerica consented to a sale at that price.

Arlington Capital also discussed the possibility of a joint venture to bid for the Debtor's assets with Chris Gildea, Motter, and Mercer ("the Gildea group"). Arlington's negotiations with the Gildea group proceeded until March 28, 2003, when  Arlington proposed a joint enterprise between Arlington and the Gildea group to bid on the Debtor's assets. The draft agreement stated that it was an agreement "by and among Arlington Capital, LLC, an Indiana limited liability company ('Arlington'), _____, an Indiana limited liability company ('_____'), and GT Holdings, LLC, an Indiana limited liability company ('GTH')." (Def. Joint App. Ex. M, Nicholson Aff. Ex. 1, Buyout Agreement Draft 1, DE 70-35.) The blank spaces were to be filled by the Gildea group, or an entity owned by the group. The draft agreement shows the parties contemplated submitting a joint bid through GTH: "Arlington and _____ are the only members of GTH," and that "GTH will not submit a bid . . . until Arlington and _____ have reached agreement on certain fundamental issues regarding cash contributions, liability for financing, operation of the Business,

19

and the terms and conditions under which _____ may purchase and Arlington will sell its interest in GTH." (*Id.*) It is not clear whether GT Holdings was ever created, and the Court is not aware of any other record of the entity.

Comerica did not know that Arlington was discussing joint ownership with the Gildea group. On March 28, 2003, Arlington sent a draft bid to Comerica listing GT Holdings as the buyer. Schedule 7.1 of the draft bid was entitled "Buyer's Members."(Werling Aff. ¶ 43–44, Ex. I,  Asset Purchase Agreement, March 28, 2003, DE 82-10.) Draft bids were sent March 30 and 31 with the same Schedule 7.1 listing. None of the bids actually included the schedules; only a list of contemplated schedules was attached.

On April 1, 2003, Arlington formed GTA Acquisition LLC, and GTA Realty, LLC, and the next day submitted a bid to purchase the Debtor's assets for $2,725,000. The only other bid submitted was that of Comerica, which was less than Arlington's bid. On April 7, 2003, GTA Realty purchased G&G's real estate.

Arlington's bid was submitted with a list of schedules. The list included reference to schedule 7.1. However, schedule 7.1 was not submitted with the bid. In previous proposed bids, it was stated that schedule 7.1 was the schedule stating who the interested parties were. Under the schedule 7.1 heading on the list of schedules, two entities were named: Arlington Capital, LLC, and GTA Investors, LLC.

Around March 31, or April 1, 2003, David Campbell resigned from his tool room manager position with the Debtor. Matt Mercer scheduled a lunch meeting with Campbell on April 2, 2003, and introduced Campbell to Mike Motter. During the meeting, Mercer tried to persuade Campbell not to resign, stating that he and Motter would be actively involved in the company in the future.

20

Two weeks later, Motter and Mercer were introduced as new owners of the company.

At some point—the timing is unclear—GT/E was formed. GT/E was owned by Katherine Gildea, Mercer and Motter. On April 4, 2003, Mercer contributed funds to GT/E. Chris Gildea received the second transfer of the $83,000 he received as a loan from Steven Gildea on the same day.

On April 7, 2003, a hearing was held to approve the proposed sale of the Debtor's assets to Arlington. Arlington did not disclose its negotiations with the Gildea group. On April 8, 2003, the bankruptcy court issued an order approving the sale. The sale order included findings that the bid was "negotiated, proposed, and executed without collusion, in good faith, as a result of arms' length negotiations." (Def. Mot. Summary J. Count I, Ex. B, DE 68-5.) Also, the court found that the auction "was conducted without collusion, in good faith, and on the terms set forth in the Procedure Order," that "[n]either the Debtor nor Buyer engaged in any conduct that would cause the sale of the Assets to be avoided under 11 U.S.C. § 363(n)," and that "the consideration to be paid for the Assets (i) is fair and reasonable; (ii) represents the highest and best offer for the Assets, and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia." (*Id.*) An amended sale order containing the same findings of fact was approved on April 16, 2003.

From April 3 until at least April 7, negotiations between the Gildea group and Arlington continued. Several drafts of agreements were exchanged. A buyout agreement was signed in a contract dated April 7, 2003. The Defendants claim the date was a mistake, and that the agreement was signed on April 10, 2003. The buyout agreement allowed GT/E to purchase GTA Acquisition from Arlington. The agreement stated that Steven Gildea, Motter, Mercer, and Chris Gildea, (the

Management Group) would be employed by GTA Acquisition, and that the agreement was contingent on the execution of employment agreements with the Management Group. The agreement allowed GT/E to purchase GTA Acquisition by paying Arlington $517,000 plus Arlington's cash contribution to GTA Acquisition. Arlington would also receive 10% of GT Acquisition's 2003 profits. GT/E also paid an extra $100,000 commission to Arlington.

The Plaintiff relies on documents Chris Gildea submitted to the Huntington bank as further explaining the relationship between Arlington and the Gildea group. In August 2003, Gildea sought financing to pay off GTA Acquisition's liability to Arlington. According to Gildea's submissions to the Huntington bank, GTA Acquisition, when still owned by Arlington, borrowed money from Arlington to purchase the Debtor's assets. When GTA Acquisition was purchased by GT/E for $617,000, it still owed Arlington the $2.7 million borrowed to purchase the Debtor's assets. GT/E sought financing to pay down its liability to Arlington. GT/E was able to secure a $600,000 loan from SkyBank to pay down GTA Acquisition's liability to $2.1 million. Though GT/E sought funding to pay down the rest of the note, which appears to have been secured by the GTA's real estate, there is no evidence it obtained sufficient financing to do so. The Defendants explain their relationship slightly differently. They state that GT/E was able to purchase the equipment from Arlington, but that they could not obtain the funding to do so. There is no evidence GT/E ever was able to pay more than its $617,000 initial payment and the $600,000 from SkyBank to Arlington. Ultimately, Arlington sold its interest in the real estate to other investors for about $2.2 million.

**2.** ***Analysis of Plaintiff's Claim for Breach of Fiduciary Duties and Fraudulent Concealment in Count IV***

The Plaintiff's fourth claim is that Motter and Chris Gildea breached their fiduciary duty and

fraudulently concealed their negotiations with Arlington. The Plaintiff's theory is that by not disclosing their negotiations with Arlington, Comerica believed that Arlington's bid through GT Acquisition was the most they could receive for the Debtor's assets and that there was no collusion in connection with the § 363 sale.

The Seventh Circuit considered similar facts in the case *In re Met-L-Wood Corp.*, 861 F.2d 1012 (7th Cir. 1988). In that case, an auction sale was held pursuant to § 363, and the trustee sued the owner of the Debtor, Frederick Pipin, alleging he secretly negotiated with potential bidders to buy back part of the debtor's assets, which he succeeded in doing. The trustee brought claims for fraud and racketeering. The Seventh Circuit held that the attempt to collect damages from the owner of the debtor and other involved parties was a "thinly disguised collateral attack on the judgment confirming the sale," and that such claims must be pursued by filing a Rule 60(b) motion to set aside the judgment approving the sale. *Id.* at 1018. The *Met-L-Wood* court dismissed claims against all the parties, not just those that were party to the sale order, stating that a proceeding under § 363 is an *in rem* proceeding transferring property rights binding against the world, not just those party to the sale order. *Id.* at 1017. The reasoning behind the court's holding was that if those involved in purchasing debtor's assets could be attacked by suits for damages after the sale was approved, the risk of bidding in bankruptcy sales would be much greater for investors, leading to depressed prices. *Id.* at 1019.

This Court held on October 17, 2005, that *Met-L-Wood* foreclosed the Plaintiff's state law damages claims against Arlington. (Opinion of October 17, 2005, DE 49.) The result is the same for the Plaintiff's claims against Gildea and Motter. In this case, the Plaintiff claims that Chris Gildea and Motter secretly negotiated to buy the Debtor's assets from Arlington before the auction,

resulting in a lower price. In other words, the Plaintiff claims the Defendants colluded to obtain a lower sale price in violation of their fiduciary duties. However, the existence of collusion in the bidding process is an issue that was already litigated at the hearing approving the sale of the Debtor's assets. The bankruptcy court found there was none. The Plaintiff's claim arises from the "same core of operative facts" that underlie the bankruptcy court's order approving the sale, and so the Plaintiff's claim is barred by res judicata. *Highway J Citizens Group v. U.S. Dept. of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006) (stating requirements for res judicata).

The Plaintiff argues that its claim is not barred because it alleges the Defendants breached their fiduciary duties to the creditors and *Met-L-Wood* held that such claims are not barred by res judicata. The Plaintiff is incorrect. In considering the claims in *Met-L-Wood*, the court noted that it "would be improper for Pipin, controlling Met-L-Wood as he did, to use his control to walk off with its principal assets for a song, shucking off the unsecured creditors in the process. That would violate the fiduciary obligation that Pipin, controlling the debtor in possession, owed Met-L-Wood's creditors." *Met-L-Wood*, 861 F.2d at 1019. However, the court did not hold that res judicata would not apply. Rather, it considered whether such a claim could be considered fraud against the court, suggesting the impropriety had to be remedied by overturning the order approving the sale. *Id.*

The cases cited by the Plaintiff do not address res judicata, or are otherwise not on point. The Plaintiff provides a host of reasons why the holding of *Met-L-Wood* is bad policy, but no good reason why *Met-L-Wood* ought not apply to the facts here. The Court is aware of no case limiting the scope of *Met-L-Wood's* broad holding, and this Court sees no justification to do so.

Even if the Court agreed with the Plaintiff that *Met-L-Wood* did not apply to the Plaintiff's claims, summary judgment would still be granted. The Plaintiff has not shown that it suffered any

harm as a result of the Defendants actions. The Plaintiff does not allege that the Defendants took advantage of their positions with the company to deter outside bidders from submitting bids, or did anything improper other than fail to disclose their negotiations. The Plaintiff has not shown how this alleged wrongdoing caused any damage to the Plaintiff. Had the negotiations been disclosed there is no evidence a higher bid would have been submitted. There is no evidence showing the Gildea group could have found financing to submit a comparable bid, except by dealing with Comerica, which it refused to do. Comerica, the only creditor having a realistic chance of recovering anything from the sale, approved the sale for $2.7 million.

The Plaintiff asks that its Complaint be construed as a Rule 60(b) motion to set aside the bankruptcy court's order approving the sale. The Court declines to do so for the same reasons stated in the Court's October 17, 2005, Opinion. (Opinion October 17, 2005, at 10–11, DE 49.)


**3.     *Analysis of Plaintiff's § 363(n) Claim in Count V***

Section 363(n) allows a trustee to avoid a sale or collect damages "if the sale price was controlled by an agreement among potential bidders at such sale." 11 U.S.C. § 363(n). The Plaintiff alleges that the Defendants entered into an agreement controlling the sale price of the Debtor's assets and seeks damages.  For the Plaintiff to prevail, "(1) there must be an agreement; (2) between potential bidders; (3) that controlled the price at bidding. *Birdsell v. Fort McDowell Sand & Gravel (In Re Sanner)*, 218 B.R. 941, 944–45 (Bankr. D. Ariz. 1998). The Plaintiff cannot show either the existence of any such agreement or that the alleged agreement would have controlled the price at bidding.

a.      *Whether an Agreement Existed*

Here, the buyout agreement between Arlington and GT/E was not entered into at least until April 7, 2003, and the agreement could not have controlled the sale price at the auction, as all bids had to have been submitted on April 2, 2003. Also, the agreement makes no reference to the auction or to the price of the assets purchased at auction. For the Plaintiff to prevail on his § 363(n) claim, he must point to some other agreement between Arlington and the Gildea group.

The Plaintiff argues there is sufficient evidence to infer the existence of an agreement to control the price of the auction sale. The Plaintiff cites an anti-trust case from 1978, *Weit v. Continental Illinois National Bank & Trust Co.*, 467 F. Supp. 197, 210 (N.D. Ill. 1978), and argues that an agreement can be inferred when circumstances show that the parties had an incentive to collude. Though the anti-trust framework is not perfectly analogous to that of a § 363(n) claim, the approach to analyzing the sufficiency of the evidence to show the existence an agreement to restrain trade is helpful in analyzing the sufficiency of the evidence showing the existence of an agreement to control the price at a bankruptcy sale. However, the Plaintiff's statement of the law is incomplete. To show a contract or conspiracy to restrain trade or commerce in violation of § 1 of the Sherman act, a plaintiff relying on circumstantial evidence must show the inference of conspiracy is reasonable in light of the competing inference of independent action. *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 599 (7th Cir. 1995). "Because there is often only a fine line separating unlawful concerted action from legitimate business practices, '[c]onduct [that is] as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). Applying these concepts to this case, the evidence is insufficient to show a

26

collusive agreement if it is as compatible with permissible conduct as it is with impermissible conduct, and the Plaintiff cannot point to any evidence tending to exclude the possibility that the Defendants conduct was permissible.

To support its allegation of an agreement between Arlington and the Gildea group to control the price at the auction sale, the Plaintiff relies on the following facts: the Gildea group's desire to purchase the Debtor's assets, the ongoing negotiations between the Gildea group and Arlington days before the sale, the Gildea group's failure to bid at the sale, and the agreement between Arlington and the Gildea group entered into shortly after the bankruptcy sale. The Plaintiff also points to the terms of the draft agreements, Motter's statements to Campbell, and the missing schedule in GTA Acquisition's bid.

The Defendants say there was no agreement and explain the Gildea group's decision not to bid at auction on their inability to obtain financing to make a bid. They argue that the evidence shows that the only available financing other than that of Arlington was from Comerica, and they refused Comerica's financing offer because their past dealings led them to distrust Comerica as a lender.

The Plaintiff has not submitted sufficient evidence to make it reasonable to infer the existence of an agreement between Arlington and the Gildea group before the auction. The evidence relied on by the Plaintiff is less compatible with the allegation that an agreement was reached than it is with the Defendants' account that no agreement was entered into until after the auction.

The timing of the agreement between Arlington and the GT insiders, and the extensive negotiations between them leading up to the sale, do not add support to the Plaintiff's case, as they are consistent with the Defendants' assertion that they did not enter an agreement until after the

27

close of bidding.

Mercer's and Motter's statements to Campbell, trying to dissuade him from ending his employment with the Debtor, are not evidence sufficient to make reasonable the inference that an agreement had already been reached between Arlington and the Gildea group. According to Campbell, on April 2, 2003, Mercer told him "he and Mike [Motter] were going to be 'actively involved' in the company in the future." (Campbell Aff. 2, DE 78.) The statement does not refer to any agreement, and many possible inferences from the statement are reasonable. The Campbell meeting does not support the Plaintiff's case over the Defendants'. Campbell states Mercer said they would be involved in the future, implying they were not yet involved. Mercer and Motter had an incentive to keep intact the company they were negotiating to buy, and their meeting with Campbell does not cast doubt on the Defendants' story. Campbell's statement is insufficient to make it more reasonable to infer that an agreement had already been reached between Arlington and the Gildea group.

The early drafts of the buyout agreement also do not support the Plaintiff's claim of a collusive agreement. The drafts of documents under consideration before the sale show the parties contemplated making a joint bid. The Defendants' first draft includes a statement that "[GT Holdings, LLC] will not submit a bid ("Bid") for the Assets and the Business until Arlington and _____ have reached agreement on certain fundamental issues."  (Def. Joint App. Ex. M, Nicholson Aff. Ex. 1, Buyout Agreement Draft 1, DE 70-35.) The Plaintiff argues this shows an intent to curb competitive bidding. Restricting the bidding of GT Holdings means only that the joint bid would not be submitted until an agreement was reached. A joint bid is not necessarily an attempt to restrict bidding. Parties might make a joint bid where they could not afford to make a bid

individually. Negotiating to make a joint bid is consistent with the Defendants' assertion that the Gildea group needed financing or another partner to be able to make a competitive bid. At any rate, nothing shows the  draft was agreed to, and nothing about it contradicts the Defendants' story that the Gildea group could not obtain the financing to get the deal together before April 2, 2003.

Finally there is schedule 7.1 of Arlington's bid to consider. The Plaintiff argues that, because GTA Investors, LLC, is included under schedule 7.1, this shows that the bid submitted by GTA Acquisition on April 2, 2003, was a joint bid. There is nothing that the Plaintiff cites that ties GTA Investors to the Gildea group. Also, there is no evidence that GTA Investors, LLC, ever existed as an entity.

The Plaintiff's allegation that the Defendants agreed to collude to avoid bidding against each other makes little sense in light of the Gildea group's failure to obtain financing to make an independent bid. The Gildea group obtained financing of about $1.4 million, which is what they offered in the initial sale motion, filed in February 2003. This is substantially less than the $2.75 million bid that Arlington submitted. Significantly, months after the contract was entered into, the Gildea group still could not obtain sufficient financing to pay off the $2.1 million remaining on the note to Arlington. GT/E paid $617,000 for the personal property of the Debtor and obtained another $600,000 loan. This is also far less than the amount they would have needed to submit a competitive bid. Because the Gildea group could not offer a competitive bid, it is not reasonable to infer that Arlington and the Gildea group colluded to avoid bidding against each other.

The Plaintiff's evidence is insufficient to allow a reasonable jury to find that the Gildea group and Arlington entered into any agreement before the sale of the Debtor's assets. The evidence presented makes it more reasonable to infer no agreement was entered, and so, summary judgment

must be entered in favor of the Defendants on this claim.

b.   *Whether the Alleged Agreement Controlled the Price at Bidding*

Even if the Court accepted the Plaintiff's assertion that the Defendants entered into an agreement before the auction, the agreement must have been one to control the price of the auction. Because there is no evidence to show the Gildea group could have made a competitive bid at the sale, the Plaintiff cannot show a material issue of fact as to whether the alleged agreement controlled the price at bidding.

An agreement controls the sale price only where an intended objective of the agreement is to influence the sale price. Where potential bidders enter an agreement, and the agreement has as an unintended consequence an affect on the sale price, the agreement does not control the sale price within the meaning of § 363(n). *In re New York Trap Rock Corp.*, 42 F.3d 747, 752 (2d Cir. 1994) ("The influence on the sale price must be an intended objective of the agreement, and not merely an unintended consequence, for the agreement among potential bidders to come within the prohibition of § 363(n).").

The Plaintiff alleges that the Defendants colluded in a manner comparable to the collusion alleged in *Trap Rock*. In *Trap Rock*, a trustee alleged that bidders colluded in violation of § 363(n) to control the price at the bankruptcy sale. *Id.* at 749–51. The auction was for the debtor's half of the ownership of a joint venture, a cement producer named CSM. *Id.* The debtor had previously agreed to sell its interest to the owner of the other half of CSM, Perez, for $36 million, contingent on no other party submitting a bid exceeding the sale price. Another party, Loma Negra, submitted a bid for $38 million for the debtor's half of CSM. *Id.* While this bid was on the table, Loma Negra

purchased the other half of the joint venture from Perez for $55 million. Perez then dropped out of bidding. *Id.*

The *Trap Rock* court explained the circumstances under which the transaction could be considered collusive in violation of § 363(n):

> Perez and Loma Negra each recognized that [the debtor's half of CSM] had a value in excess of $38 million and would fetch a higher price if both of them bid competitively, permitting [the debtor] to realize full value; Perez and Loma Negra agreed it was preferable that they should share the value of [the debtor's half of CSM] to the extent it exceeded $38 million; they therefore agreed that Perez would drop out, leaving Loma's $38 million bid unsurpassed, and that they would adjust between them to share the profit that, but for their collusion, would have gone to [the Debtor]. Loma Negra's payment of $55 million to Perez for the other half of CSM included a division between them of the profit resulting from Loma Negra's unopposed bargain purchase of [the debtor's] half of CSM.

*Id.* at 753. If, by selling its interest in CSM to Loma Negra, the parties also agreed that Perez would not bid on the debtor's interest in CSM, the agreement would be one to control the price of the sale in violation of § 363(n). *Id.* at 753–54 ("To the extent [the debtor's] complaint alleges that it was a term of the Loma Negra-Perez agreement (whether written or unwritten) that Perez would drop out of the bidding for [the Debtor's] half of CSM, the complaint alleges a prohibited voidable transaction under § 363(n).").

The *Trap Rock* court also stated that if the plaintiff could not produce evidence of an agreement that Perez would not bid, there would be no violation of § 363(n). The court also noted that there were many other legal reasons for Perez to drop out of bidding, including the fact that it no longer had an interest in CSM after it sold its interest in it to Loma. Only if there was an agreement that a party would drop out of bidding would there be a violation of § 363(n) in these circumstances. *Id.*

In this case, even if the Plaintiff could show that the Defendants entered into an agreement,

he could not show that the agreement controlled the price at auction. Because the Gildea group lacked the financing to submit an independent bid to compete with Arlington, it would not be reasonable to infer that the intent behind the agreement was to obtain a lower auction price. There is nothing suggesting an agreement by which the Gildea group would not submit a bid or an intent to obtain a lower sale price.

## G.      Defendants' Claims for Attorney Fees

The Defendants claim they are entitled to attorneys' fees pursuant to 28 U.S.C. § 1927 because  the Plaintiff has "unreasonably and vexatiously prolonged this proceeding by continuing to pursue" his meritless claims. (Def. Br. 18, DE 65.) Section 1927 states: "Any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. In other words, "'If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious.'" *Kapco Mfg. Co.,  Inc. v. C & O Enters., Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989) (quoting *In re TCI*, 769 F.2d 441, 445 (7th Cir. 1985)).

The Court is not convinced that any of the Plaintiff's claims were so unsound that bringing them qualifies as objectively unreasonable, or that they were brought in bad faith. A reasonable attorney could believe the Plaintiff's claims were not frivolous.

## ORDER

For the reasons stated above, the pending motions are resolved as follows:

Defendant Chris Gildea's motion for summary judgment on Count I [DE 68] is DENIED. Gildea's motion to strike [DE 89] is DENIED, and Plaintiff's Motion for further discovery on its first claim [DE 106] is GRANTED. The Plaintiff's motion to strike Gildea's evidence regarding the Plaintiff's first claim [DE 95] is DENIED.

The Court declines to rule on Defendant Chris Gildea's motion for summary judgment on Count II [DE 69] until the Plaintiff has had an opportunity to respond to the new evidence presented in Gildea's Reply. The Plaintiff is allowed 15 days to file a sur-response to Gildea's Motion for summary judgment on Count II. Gildea's motion to strike [DE 91] is DENIED. The Plaintiff's motion to strike Gildea's evidence regarding the Plaintiff's second claim [DE 95] is DENIED.

The Defendants' motion for summary judgment on Count III [DE 66] is GRANTED. The Plaintiff's motion to strike the affidavit of Steven Gildea [DE 97] is DENIED.

Defendants' motions for summary judgment on Plaintiff's Counts IV and V [DE 64 and 71] are GRANTED. The Plaintiff's motion to strike the Defendants' Reply Brief [DE 99] is DENIED.

The following Defendants are DISMISSED from the case: Katherine Gildea, Michael Motter, Matt Mercer, Anita Gildea, GT Acquisition LLC, GT Enterprises LLC, Gildea & Gorman LLC, and Arlington Capital LLC. Claims against Defendants Chris Gildea and Gasson, LLC, remain pending.

SO ORDERED on October 5, 2006.

S/ Theresa L. Springmann
THERESA L. SPRINGMANN, JUDGE
UNITED STATES DISTRICT COURT