**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

SEE AMENDED ORDER
(DOCKET ENTRY 139)
REGARDING ADDITIONAL
LANGUAGE AT PAGE 27 OF
THIS ORDER

| | | |
|---|---|---|
| R. DAVID BOYER, TRUSTEE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:05-CV-129-TS |
| | ) | |
| CHRISTOPHER GILDEA et. al, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION**

On October 5, 2006, this Court entered its Opinion and Order dismissing three counts filed by the Plaintiff, Trustee David Boyer, against the Defendants Katherine Gildea, Michael Motter, Matt Mercer, Anita Gildea, Arlington Capital LLC, GT Acquisition LLC, GT Enterprises LLC, and Gildea & Gorman LLC. On October 16, 2006, the Trustee filed motion to reconsider. Having carefully examined the parties' briefings and upon reconsideration of the evidence before it, the Court sees no good reason to alter its decision to dismiss the Trustee's Counts III and IV. However, the Court finds that the Trustee has presented sufficient evidence to create a triable issue of fact on Count V as to whether the Defendants entered an agreement with the intent to control the price at auction.

The Trustee's Counts I and II remained pending against Chris Gildea and Gasson LLC after the Court's October 5, 2006, Opinion and Order. Count I states a claim against Chris Gildea to avoid a transfer of $170,000 made from the bankruptcy debtor to Chris Gildea. The Court found that there was a issue of fact as to whether the transfer occurred, and denied the motion for summary judgment on Count I. Count II also states a claim against Chris Gildea to avoid a transfer of funds from the bankruptcy debtor to Chris Gildea. Because Gildea submitted additional evidence with his reply, the Court allowed the Trustee to file a surresponse. For the reasons stated below, the Court finds that there is an issue of fact as to whether the transfer of

funds from the debtor to Chris Gildea was in the ordinary course of business.

## A.      Background

This case arose out of the bankruptcy of GT Automation Inc. (the Debtor). Steven Gildea was the president of the Debtor and sole equity owner. Defendant Anita Gildea is Steven Gildea's wife. Steven and Anita Gildea were the sole directors of the Debtor. Defendant Chris Gildea, Steve Gildea's son, was an officer of the Debtor. Chris Gildea also owned Defendant Gasson, LLC, which leased equipment to the Debtor. Defendant Katherine Gildea is Chris Gildea's spouse.

The Debtor filed for bankruptcy on October 9, 2001, and the bankruptcy court allowed the Debtor to continue operating as a debtor-in-possession. Comerica was the Debtor's largest secured creditor and held a first priority security interest and lien on all of its assets. Comerica filed a proof of claim in the bankruptcy proceedings for $7,818,406.10.

In February 2003, the Debtor moved for an order authorizing an auction of the Debtor's assets. A group including Gildea family members and officers of the Debtor sought to purchase the Debtor's assets (the Gildea Group). The bankruptcy court issued an order allowing an auction of the Debtor's assets pursuant to 11 U.S.C. § 363, subject to conditions agreed to by the Debtor and its creditors.

The auction for the Debtor's assets was held on April 3, 2003. Defendant GTA Acquisition LLC, submitted a bid of $2,725,000, which was the highest bid. The only other bid was a credit bid submitted by Comerica. GTA Acquisition was an entity created by Defendant Arlington Capital on about April 1, 2003, for the purpose of acquiring the Debtor's assets. Arlington also formed GTA Realty, LLC, for the purpose of taking title to the real estate. On April 7, 2003, the bankruptcy court approved the sale of the Debtor's assets to GTA Acquisition. On April 16, 2003, an amended sale order was issued. There were no objections to the sale.

2

On April 7, 2003, GTA Acquisition was acquired by Defendant GT Enterprises, LLC, (GT/E). GT/E was formed and is owned by Katherine Gildea, Mike Motter, and Matt Mercer. Matt Mercer was a Vice President of the Debtor. Mike Motter was the Debtor's accountant.

This case was filed on April 7, 2004. The Trustee's Complaint states claims against Christopher Gildea, Katherine Gildea, Michael Motter, Matt Mercer, Anita Gildea, Arlington Capital, LLC, GT Acquisition LLC, GT Enterprises, LLC, Gasson, LLC, and Gildea & Gorman, LLC. An amended complaint was filed on October 18, 2004. The Amended Complaint lists eight counts.

The Court granted summary judgment to Arlington Capital on the Trustee's state law claims against it (Counts VI to VIII of the Amended Complaint) on October 17, 2005, finding the bankruptcy court's April 16, 2003, Amended Sale Order precluded such claims. The Court stated that the state law claims could be brought only if the Amended Sale Order was set aside. In response, the Trustee brought a separate case alleging fraud on the court and seeking to alter the Amended Sale Order. (*Boyer v. GT Acquisition*, 1:06-CV-90, (N.D. Ind. filed March 22, 2006). The bankruptcy court declined, stating that granting the requested relief probably would not remove the preclusive effect of the Amended Sale Order, and holding that a judgment that is alleged to have been obtained by fraud on the court cannot be amended, it must be vacated. The Trustee appealed, and this Court agreed with the bankruptcy court as stated in its Opinion and Order of August 9, 2007.

On October 5, 2006, the Court granted summary judgment on Counts III, IV, and V, denied summary judgment on Count I, and withheld ruling on Count II pending further briefing. Counts I and II sought to set aside transfers of Debtor funds to Chris Gildea, and Count III was to set aside a transfer of Debtor funds to G&G. Count IV was a state law claim alleging that Mike Motter and Chris Gildea breached their fiduciary duties to the Debtor. Count V alleged that Arlington Capital, GT/E, Chris Gildea, Katherine Gildea, Mike Motter, and Matt Mercer

3

colluded to control the price of the Debtor's assets at the auction sale.

On October 16, 2006, the Trustee filed a motion to alter judgment, arguing that the Court erred in granting summary judgment on Counts III, IV, and V. On October 31, 2006, the Defendants responded to the motion, and the Trustee replied on November 7, 2006.

On October 19, 2006, the Trustee submitted its surresponse to Chris Gildea's motion for summary judgment on Count II.

On October 31, 2006, Defendants moved for an entry of final judgment under Rule 54(b). The Trustee responded on November 15, 2006, and the Defendants replied on November 22, 2006.

## A.       Trustee's Count II

Pursuant to 11 U.S.C. § 549, Count II of the Trustee's Complaint seeks to avoid more than $30,000 of the Debtor's payments to Chris Gildea, which were allegedly made to reimburse Gildea for ordinary business expenses of the Debtor. At issue is whether the payments were in fact ordinary business expenses.

### *1.       Summary Judgment Standard*

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). After adequate time for discovery, summary judgment must be given against a party "who fails to make a showing sufficient to establish the existence of an

4

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Only material facts will preclude summary judgment; irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Anderson*, 477 U.S. at 248–49. If there is no genuine issue of material fact, the only question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wisc. Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

2.      ***Facts Relevant to Count II***

Chris Gildea states that he used his credit card to charge and pay for necessary expenses of the Debtor during the normal course of the Debtor's business, and that these expenses were routinely reimbursed by the Debtor. Gildea claims these reimbursements were fully disclosed in the Debtor's operating reports or bank statements, and were of the same type of expense the Debtor routinely reimbursed for other employees. Gildea submitted the affidavit of Thomas Norris, which states that the type of reimbursement challenged by the Trustee was routinely given to the Debtor's employees in the ordinary course of its business, and that the Debtor's records show no change in the amounts of such reimbursements after the Debtor petitioned for bankruptcy.

The business records submitted with Norris's affidavit show reimbursements made by the Debtor from May 1998 to October 2001, the three years before the Debtor filed for bankruptcy, and from October 2001 to April 2003, the year and a half following the bankruptcy filing. During the first period, Chris Gildea received $37,265.04 in reimbursements, and in the second period, he received $34,057.84 in reimbursements. The total amount of reimbursements paid by the Debtor in the first period was $145,477.25, and the total in the second period was $69,279.55. Norris states that the expenditures listed in the documents were for "expenses of the Debtor that were ordinary in nature and type." (Norris Aff. 2, DE 87.)

The Trustee submitted the affidavit of Mark Werling, who represented Comerica, stating that Werling received post-bankruptcy disbursement ledgers from the Debtor showing reimbursements of over $30,000 for expenses paid by Gildea. Werling's affidavit states that he was told by Mike Motter in an e-mail that Gildea's credit card was used when the Debtor did not have otherwise available funds. The Trustee submits the Debtor's ledger for the pre-bankruptcy period as evidence that such payments to Gildea were not made prior to bankruptcy, suggesting the post-bankruptcy payments were not part of the ordinary course of the Debtor's business.

**3.      *Analysis***

Title 11 U.S.C. § 549 allows a bankruptcy trustee to avoid a transfer of property of the bankruptcy estate if the following elements are met: 1) there is a transfer of property; 2) the property transferred is that of the bankruptcy estate; 3) the transfer was made after the commencement of the case; and 4) the transfer was not authorized by the Bankruptcy Code or by the bankruptcy court. *In re Blair*, 330 B.R. 206, 213 (Bankr. N.D. Ill. 2005). "Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof." Fed. R. Bankr. P. 6001. If a business is allowed to continue operating after filing for bankruptcy, it may continue to obtain unsecured debt and enter transactions if the business does so in the

7

course of ordinary operations. 11 U.S.C. § § 363(c)(1); 364(a).

The Trustee claims the Debtor reimbursed payments made by Chris Gildea for the Debtor without authorization and not in the ordinary course of business, and therefore, the transactions ought to be avoided. Gildea argues the reimbursements were made in the ordinary course of business.

The bankruptcy code does not define "ordinary course of business," but courts have fashioned a test to determine whether a transaction was in the ordinary course of business. A transaction is in the ordinary course of business only if it is "most likely" the case that 1) the transaction does not expose "a hypothetical creditor to economic risks different from those accepted when such creditor initially extended credit to the debtor," and 2) the transaction at issue is comparable to the types of transactions entered into by similar businesses.[1] *Matter of Garofalo's Finer Foods, Inc.*, 186 B.R. 414, 424 (N.D. Ill. 1995) (quoting *In re Garofalo's Finer Foods, Inc.*, 164 B.R. 955, 962–63 (Bankr. N.D. Ill. 1994)). A creditor's reasonable expectations are "based in large part upon the debtor's specific pre-petition business practices and norms and the expectation that the debtor will conform to those practices and norms while operating as a debtor-in-possession," and therefore, a "fundamental characteristic of an 'ordinary' post-petition business transaction is its similarity to a pre-petition business practice." *Id.* at 425.

Gildea argues the affidavit of Thomas Norris and the supporting documents show that the reimbursements made to Chris Gildea conform to the Debtor's pre-bankruptcy business practices. The supporting documentation shows that Chris Gildea received $37,265.04 in reimbursements during the three years prior to bankruptcy, and  $34,057.84 in reimbursements during the year and a half following bankruptcy. The total amount of reimbursements paid by the Debtor in the first period was $145,477.25, and the total in the second period was $69,279.55.

---

[1]No evidence was presented on transactions entered into by other similar businesses.

The amount of reimbursements Gildea received after bankruptcy increased, while at the same time, the overall amount of reimbursements stayed roughly the same. No explanation is offered as to why the relative amount of reimbursements to Gildea would have increased.

The Trustee presents the Debtor's pre-bankruptcy-petition ledger as evidence that Gildea's reimbursements were not made in the ordinary course of business. The Trustee argues that the pre-bankruptcy ledger shows no reimbursement in any amount to Chris Gildea pre-bankruptcy. The Court has reviewed the pre-bankruptcy ledger and found several entries that could be reimbursement payments to Chris Gildea. For example, one entry shows a debit of $657.50 to Chris Gildea on January 17, 2001, (Pl. Ex. U (6 of 15) at 11, DE 83-6), and another shows a debit of $258.00 to Chris Gildea on January 17, 2001, (Pl. Ex. U (15 of 15) at 17, DE 83-16). However, the Court cannot match any of the pre-bankruptcy ledger entries of payments to Chris Gildea with the records of pre-bankruptcy reimbursements submitted by Norris.[2] The Court has been given no information on the record-keeping practices of the Debtor or any explanation as to why Norris's records would not match the pre-bankruptcy ledger. Without any guidance as to how to interpret the parties' submissions, and in light of the discrepancies between Norris's records and the ledger entries, the Court cannot accept Norris's records as established facts. The Defendant has the burden of proof on whether the reimbursements were made in the ordinary course of business, and its evidence is called into doubt by the pre-bankruptcy ledger. Based on the evidence before the Court, a reasonable jury could find that Norris's records are not accurate, and that there were no similar pre-bankruptcy reimbursements to Chris Gildea, leading to the conclusion that Chris Gildea's post-bankruptcy reimbursements were not in the ordinary course of business.

---

[2] The Court was able to match some of the ledger entries of Debtor payments to Norris's records. For example, both the pre-bankruptcy ledger and Norris's records list as expenses $781.79 to Anita Gildea on January 8, 2001, $76.86 to Greg Bulmahn on August 17, 2001, and $52.00 to Milt Brown on April 10, 2001.

For these reasons, the Court finds that there is a material issue of fact as to whether the post-bankruptcy reimbursements to Chris Gildea were made in the ordinary course of business, and the question is for a jury to determine at trial.

**B.      Motion to Reconsider**

The Trustee asks the Court to reconsider its dismissal of Counts III, IV, and V. As argued by the Defendants, the reconsideration is pursuant to Rule 54(b), which states that until a final judgment is entered, an order that does not adjudicate all of the claims of all of the parties is "subject to revision at any time." Fed. R. Civ. P. 54(b).

"Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996).

> A party seeking to defeat a motion for summary judgment is required to "wheel out all its artillery to defeat it." Belated factual or legal attacks are viewed with great suspicion, and intentionally withholding essential facts for later use on reconsideration is flatly prohibited. Reconsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion.

*Id.* at 1270 (quoting *Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency*, 846 F. Supp. 677, 685 (N.D. Ill. 1994)) (citations removed). However, "[a] motion for reconsideration performs a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). "The rule essentially enables a district court to correct its own errors, sparing the parties and the appellate courts the burden of unnecessary appellate proceedings." *Russell v. Delco Remy Div. Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995).

*1.*      ***The Trustee's Arguments to Reconsider Count III***

In arguing for reconsideration of the Court's ruling on Count III, the Trustee presents a wholly new theory that was not anywhere argued in his brief opposing summary judgment. The Court understood the Trustee's third Count to allege that the Debtor transferred $83,000 to G&G for the purpose of funding the Gildea Group's purchase of the Debtor's assets. Steven Gildea was the owner of G&G and of the Debtor, and the Trustee alleged that the money was eventually used by GT/E to help purchase GTA Acquisition.

The Trustee's Amended Complaint alleges that:

> The Debtor was not authorized to transfer $83,000 in cash to G&G because (1) it had not assumed or assigned its lease with G&G; (2) the payments were not permitted under the lease; (3) it allegedly owed G&G more than $500,000; and (4) G&G did not utilize such payments for any purpose which benefited GT Automation. . . . These transfers were made, instead, for the purpose of funding an undisclosed buyout of the Debtor's assets.

(Pl. Am. Compl. 24, DE 12.) In its Response Brief and statement of material facts, the Trustee referred to a single $83,000 transfer by the Debtor to G&G. (Pl. Resp. Br. 7–9, DE 75 ("[Steven Gildea] then offered several explanations for the unusual size of the $83,000 Transfer and why it was paid by the Debtor directly into his bank account."); ("Steven Gildea's account is also internally inconsistent, thereby shedding doubt on the actual purpose for the $83,000 Transfer and whether it was authorized."); Pl. Statement Genuine Issues 6, DE 76 ("Steven Gildea testified that he 'inadvertently' deposited the $83,000 Transfer he received from the Debtor for G&G into his personal account in April 2003. He claimed this fund was subsequently paid to GTA in satisfaction of an account receivable.")). The Court held that the Trustee failed to prove the existence of an $83,000 transfer from the Debtor to G&G, and that the only payments made by the Debtor to G&G were disclosed rental payments.

These rental payments were never argued to be extraordinary expenses. Nowhere did the Trustee argue or imply that the Debtor overpaid its rent. The only reference the Trustee made to

11

the Debtor's rental payments to G&G was a reference to Steven Gildea's statement that the usual rent payable to G&G was $17,000. Instead, the Trustee focused on what happened to the $83,000 after G&G transferred it. As the Court noted in its Opinion and Order of October 5, 2006, "All of the Plaintiff's arguments and evidence relate to the propriety of transfers of G&G's funds, not the Debtor's funds." (Op. & Order Oct. 5, 2006, at 17, DE 112.) The Court found no evidence had been presented calling into question the propriety of the Debtor's rent payments to G&G.

The Trustee argues that the Court erred because it failed to anticipate the "very simple" argument that the Trustee now makes for the first time in his motion to reconsider: that the lease requires rent payments in the amount sufficient to cover certain, specified costs; that G&G did not use $83,000 of the rental payments to cover those specified costs; that instead, Steven Gildea withdrew the $83,000 and used it to help fund the Gildea Group's purchase of the Debtor's assets from Arlington, and that this implies the Debtor overpaid its rental obligation. This overpayment is therefore not an ordinary business expense and may be avoided. What is left unsaid is why the Trustee's brief never discussed the Debtor's rental payments or claimed they were more than required by the lease. The Trustee failed to point to any evidence suggesting the rent was not an ordinary business expense.

The Trustee suggests the Court failed to grasp his theory because it mistakenly stated that the Debtor leased space from G&G for $17,000 a month. The Court agrees that this statement was not an accurate statement of the facts. A more accurate statement would be that Steven Gildea stated the usual amount of rent was $17,000, and that the Debtor paid that amount of rent from October 2002 to January 2003 (though for the nine months before that, the Debtor paid on average about $13,000). The Trustee postulates that this mistake could have been caused by the fact that "the Trustee argued [the purposes of the lease] were not satisfied without expressly pinpointing the fact that the rental term was variable, not fixed." (Pl. Br. 8, DE 115.) This is incorrect. The Trustee never argued that the purposes of the lease were not satisfied, or even

12

suggested that the terms of the lease were in any way relevant to his claim.

Arguments raised for the first time in a motion to reconsider are waived if they could have been raised in responding to the original motion. *Mungo v. Taylor*, 355 F.3d 969, 978 (7th Cir. 2004). The Trustee makes no argument as to why his theory could not have been presented in his first brief. Perhaps the Trustee did intend to make that argument (it makes much more sense than what was argued) but his intent does not excuse the fact that the argument was completely absent. Where as here, a well-represented party presents a wholly new theory on a motion for reconsideration and makes no attempt to explain why the theory was not presented in its previous submissions, this Court is disinclined to reopen the matter. This is even more true when the record is voluminous and complicated, and the time necessary for the Court to familiarize itself with the record and respond to the arguments presented is substantial. The expectation is that counsel will raise the issues that are to be decided. *Nat'l Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 360 (7th Cir. 1987) ("[A] trial judge may properly depend upon counsel to apprise him of the issues for decision. He is not obligated to conduct a search for other issues which may lurk in the pleadings."(quoting *Desert Palace v. Salisbury*, 401 F.2d 320, 324 (7th Cir. 1968)).


**2.**      *The Trustee's Argument's to Reconsider Count IV*

The Trustee has nothing new to say regarding Count IV, and the Court has nothing to add to its previous Opinion. The Court has held that under *In re Met-L-Wood*, 861 F.2d 1012 (7th Cir. 1988), the Trustee is barred from bringing state law claims arising out of a bankruptcy sale of assets, and sees no good reason to address the issue a third time. (*See* Opinion and Order of October 5, 2006, DE 115; Opinion and Order of October 17, 2005, DE 49.)


**3.**      *The Trustee's Arguments to Reconsider Count V*

Most of the Trustee's argument is reserved for the Court's dismissal of Count V. The Court summarizes his arguments as follows: first, the Court failed to take account of the entire context of the relationship between Arlington and the Gildea Group, especially the circumstances involving the Gildea Group's spurning of financing from Comerica and the start of its negotiations with Arlington; second, the Court improperly relied on antitrust cases to formulate a higher standard for summary judgment than was required. Upon reconsideration, the Court finds that the evidence submitted shows there is a material issue of fact as to whether the Gildea Group stopped negotiating with Comerica and began negotiating with Arlington independently or as part of an agreement to collude. The Trustee has submitted sufficient evidence to make reasonable an inference that the Defendants agreed to control the price at auction.

a.      *Facts Relevant to Count V*

Steven Gildea hoped to retain ownership of the Debtor after declaring bankruptcy on October 9, 2001. To this end, Steven Gildea and a group associated with Steven Gildea, including his son Chris Gildea, submitted their Amended Plan Offer in July of 2002. The Amended Plan Offer would have involved Comerica financing a purchase of the Debtor's assets for $3.45 million dollars. Comerica desired a competitive bidding process, and declined the offer. On December 19, 2002, the Gildea Group discussed with Mark Werling, an attorney for Comerica, the possibility of purchasing the Debtor's assets. Comerica continued to insist on an auction.

On February 12, 2003, the Debtor filed a motion seeking authorization of an auction of the Debtor's assets pursuant to § 363(b) and (f). Included in the motion was an offer to buy the Debtor's assets from G&G and an entity named GT Acquisition, which consisted of Chris Gildea and Anita Gildea, along with the Debtor's employees Matt Mercer and Joseph Siela. The offer

14

was that G&G would purchase the Debtor's real estate for $607,329.92, and the GT Acquisition would buy the rest of the Debtor's assets for $600,000. The Gildea Group sought several loans to finance this proposed purchase. The evidence submitted indicates the Gildea Group had the possibility of obtaining a combined loan of about $1.4 million.

In about the middle of February, counsel for Comerica contacted Arlington Capital and provided information about the Debtor. At this time, Arlington was the only party other than the Gildea Group that had expressed interest in purchasing the Debtor's assets.

Two managing members of Arlington met with Steven Gildea, Chris Gildea, and Michael Motter in late February 2003 to discuss a possible investment in the Debtor by Arlington.

On February 25, 2003, Werling called an attorney associated with the Gildea Group to determine if they would pay $3.7 million for the Debtor's assets. On February 27, 2003, Werling discussed with Chris Gildea Comerica's proposal to finance an offer of $3.7 million. Chris Gildea stated that he was disappointed Comerica did not respond to him sooner and that the Gildea Group would not pay $3.7 million. Werling asked whether there was a lower number that the Gildea Group would offer, Gildea said no, but that he might follow up later after reviewing his calculations. On March 3, 2003, Comerica sent term sheets to a buyout group consisting of Gildea, Motter, and Mercer, regarding a proposed acquisition for about $3.7 million. Comerica never received a response from the Gildea Group. Chris Gildea later stated he was not interested in dealing with Comerica because he did not trust them to treat the company fairly.

A hearing was held on the motion for a sale of the Debtor's assets on March 5, 2003. The Committee of Unsecured Creditors objected to a sale, arguing that the Gildea Group was seeking a sale to defeat the interests of unsecured creditors. Also, a Comerica representative stated that it would block the Gildea Group from cheaply purchasing the Debtor's assets at a sale. The Committee agreed not to object to an auction if it had the opportunity to object before the sale was approved.

15

On March 13, 2003, the bankruptcy court issued an order allowing an auction of the Debtor's assets, subject to conditions agreed to by the Debtor and the objecting creditors. Bids were to be submitted by April 2, 2003, and were to be in the form of an agreement of a binding offer to purchase the Debtor's assets. Bids were required to fully disclose the identity of the entities that would acquire a portion of the Debtor's assets in connection with the bid.

Around March 5, 2003, Arlington Capital began negotiating with Comerica over the price at which Comerica would consent to a sale of the Debtor's assets. Negotiations continued throughout March. Arlington increased its initial offer from about $1.4 million to $2.7 million and on April 2, 2003, Comerica consented to a sale at that price.

Arlington stated that it was interested in buying the Debtor as a going concern with its current management in place, which included members of the Gildea Group. Arlington negotiated with the Gildea group regarding their interest in owning a portion of a company succeeding the Debtor. On March 28, 2003, Arlington presented a proposal for a joint enterprise between Arlington and the Gildea group to bid on the Debtor's assets. The draft agreement stated that it was an agreement "by and among Arlington Capital, LLC, an Indiana limited liability company ('Arlington'), _____, an Indiana limited liability company ('_____'), and GT Holdings, LLC, an Indiana limited liability company ('GTH')." (Def. Joint App. Ex. M, Nicholson Aff. Ex. 1, Buyout Agreement Draft 1, DE 70-35.) The blank spaces were to be filled by the Gildea Group, or an entity owned by the group. The draft agreement shows the parties contemplated submitting a joint bid through GTH: "Arlington and _____ are the only members of GTH," and that "GTH will not submit a bid . . . until Arlington and _____ have reached agreement on certain fundamental issues regarding cash contributions, liability for financing, operation of the Business, and the terms and conditions under which _____ may purchase and Arlington will sell its interest in GTH." (*Id.*) It is not clear whether GT Holdings was ever created, and the Court is not aware of any other record of the entity.

16

Comerica did not know that Arlington was discussing joint ownership with the Gildea Group. On March 28, 2003, Arlington sent a draft bid to Comerica listing GT Holdings as the buyer. Schedule 7.1 of the draft bid was entitled "Buyer's Members."(Werling Aff. ¶ 43–44, Ex. I,  Asset Purchase Agreement, March 28, 2003, DE 82-10.) Draft bids were sent March 30 and 31 with the same Schedule 7.1 listing. None of the bids actually included the schedules; only a list of contemplated schedules was attached.

On April 1, 2003, Arlington formed GTA Acquisition LLC, and GTA Realty, LLC. On April 2, 2003, Arlington submitted a bid to purchase the Debtor's assets for $2,725,000. The only other bid submitted was that of Comerica, which was less than Arlington's bid. On April 7, 2003, GTA Realty purchased G&G's real estate.

Arlington's bid was submitted with a list of schedules. The list included reference to schedule 7.1. However, schedule 7.1 was not submitted with the bid. In previous proposed bids, it was stated that schedule 7.1 was the schedule stating who the interested parties were. Under the schedule 7.1 heading on the list of schedules, two entities were named: Arlington Capital, LLC, and GTA Investors, LLC.

Around March 31, or April 1, 2003, David Campbell resigned from his tool room manager position with the Debtor. Matt Mercer scheduled a lunch meeting with Campbell on April 2, 2003, and introduced Campbell to Mike Motter. During the meeting, Mercer tried to persuade Campbell not to resign, stating that he and Motter would be actively involved in the company in the future. Two weeks later, Motter and Mercer were introduced as new owners of the company.

At some point—the timing is unclear—GT/E was formed. GT/E was owned by Katherine Gildea, Mercer and Motter. On April 4, 2003, Mercer contributed funds to GT/E. Chris Gildea received the second transfer of the $83,000 he received as a loan from Steven Gildea on the same day.

17

On April 7, 2003, a hearing was held to approve the proposed sale of the Debtor's assets to Arlington. Arlington did not disclose its negotiations with the Gildea group. On April 8, 2003, the bankruptcy court issued an order approving the sale. The sale order included findings that the bid was "negotiated, proposed, and executed without collusion, in good faith, as a result of arms' length negotiations." (Def. Mot. Summary J. Count I, Ex. B, DE 68-5.) Also, the court found that the auction "was conducted without collusion, in good faith, and on the terms set forth in the Procedure Order," that "[n]either the Debtor nor Buyer engaged in any conduct that would cause the sale of the Assets to be avoided under 11 U.S.C. § 363(n)," and that "the consideration to be paid for the Assets (i) is fair and reasonable; (ii) represents the highest and best offer for the Assets, and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia." (*Id.*) An amended sale order containing the same findings of fact was approved on April 16, 2003.

From April 3 until at least April 7, negotiations between the Gildea Group and Arlington continued. Several drafts of agreements were exchanged. A buyout agreement was signed in a contract dated April 7, 2003. The Defendants claim the date was a mistake, and that the agreement was signed on April 10, 2003. The buyout agreement allowed GT/E to purchase GTA Acquisition from Arlington. The agreement stated that Steven Gildea, Motter, Mercer, and Chris Gildea, (the Management Group) would be employed by GTA Acquisition, and that the agreement was contingent on the execution of employment agreements with the Management Group. The agreement allowed  GT/E to purchase GTA Acquisition by paying Arlington $517,000 plus Arlington's cash contribution to GTA Acquisition. Arlington would also receive 10% of GT Acquisition's 2003 profits. GT/E also paid an extra $100,000 commission to Arlington.

The Trustee relies on documents Chris Gildea submitted to the Huntington bank as

further explaining the relationship between Arlington and the Gildea group. In August 2003, Gildea sought financing to pay off GTA Acquisition's liability to Arlington. According to Gildea's submissions to the Huntington bank, GTA Acquisition, when still owned by Arlington, borrowed money from Arlington to purchase the Debtor's assets. When GTA Acquisition was purchased by GT/E for $617,000, it still owed Arlington the $2.7 million borrowed to purchase the Debtor's assets. GT/E sought financing to pay down its liability to Arlington. GT/E was able to secure a $600,000 loan from SkyBank to pay down GTA Acquisition's liability to $2.1 million. GT/E sought funding to pay down the rest of the note, which appears to have been secured by GTA's real estate, but it did not obtain sufficient financing to do so. There is no evidence GT/E ever was able to pay more than its $617,000 initial payment and the $600,000 from SkyBank to Arlington. Ultimately, Arlington sold its interest in the real estate to other investors for about $2.2 million.

b.      *The Trustee's Argument's to Reconsider Count V*

Section 363(n) allows a trustee to avoid a sale or collect damages "if the sale price was controlled by an agreement among potential bidders at such sale." 11 U.S.C. § 363(n). The Trustee alleges that the Defendants entered into an agreement controlling the sale price of the Debtor's assets and seeks damages.  For the Trustee to prevail, "(1) there must be an agreement; (2) between potential bidders; (3) that controlled the price at bidding. *Birdsell v. Fort McDowell Sand & Gravel (In Re Sanner)*, 218 B.R. 941, 944–45 (Bankr. D. Ariz. 1998). An agreement controls the sale price only where an intended objective of the agreement is to influence the sale price. Where potential bidders enter an agreement, and the agreement has as an unintended consequence an affect on the sale price, the agreement does not control the sale price within the meaning of § 363(n). *In re New York Trap Rock Corp.*, 42 F.3d 747, 752 (2d Cir. 1994) ("The influence on the sale price must be an intended objective of the agreement, and not merely an

19

unintended consequence, for the agreement among potential bidders to come within the prohibition of § 363(n).").

In the Court's Opinion and Order of October 5, 2006, the Court held that the Trustee did not submit sufficient evidence to make reasonable an inference that the Defendants entered an agreement with the intent to influence the auction price. In briefing the motion for summary judgment, the parties focused their arguments on the events directly leading up to the bid and immediately following the bid. Neither party addressed the Gildea Group's reasons for walking away from Comerica's financing with any detail. The Defendants noted in their reply that the "GT Defendants rejected Comerica's offer before Arlington's involvement" and cited to evidence submitted by the Trustee which appears to support the statement. (Werling Aff. 3–4, DE 82.) Werling did not describe in his affidavit any meeting between Arlington and the Gildea Group before March 7, 2003, over a week after Chris Gildea declined to continue negotiating with Comerica. The Trustee argued that the Gildea Group's withdrawal from competitive bidding, decision not to accept Comerica financing, and negotiations with Arlington suggested concerted action. He also argued that the Gildea Group had financing available from Comerica, as evidenced by Comerica's offer to finance a sale for $3.7 million and Werling's question to Chris Gildea about whether the Gildea Group would submit a lower offer. The Trustee did not specifically point to any evidence suggesting that the Gildea Group's decision to negotiate with Arlington was tied to the its decision to stop negotiating with Comerica.

The Court held that the Trustee lacked sufficient evidence to allow a reasonable jury to infer from the evidence that the Defendants entered an agreement to control the auction price because there was no evidence the Defendants could have submitted a competitive bid due to their lack of financing. The Court's opinion on this point is summarized by the following passage:

The Plaintiff's allegation that the Defendants agreed to collude to avoid bidding

against each other makes little sense in light of the Gildea group's failure to obtain financing to make an independent bid. The Gildea group obtained financing of about $1.4 million, which is what they offered in the initial sale motion, filed in February 2003. This is substantially less than the $2.75 million bid that Arlington submitted. Significantly, months after the contract was entered into, the Gildea group still could not obtain sufficient financing to pay off the $2.1 million remaining on the note to Arlington. GT/E paid $617,000 for the personal property of the Debtor and obtained another $600,000 loan. This is also far less than the amount they would have needed to submit a competitive bid. Because the Gildea group could not offer a competitive bid, it is not reasonable to infer that Arlington and the Gildea group colluded to avoid bidding against each other.

(Opinion and Order of Oct. 5, 2006, at 29, DE 112.) The Court did not address whether there was an issue of fact as to whether the Gildea Group independently turned down financing from Comerica. The Court accepted as true the Defendants' argument that "GT Defendants rejected Comerica's offer before Arlington's involvement," and the implication that the Defendants' decision to decline financing from Comerica was independent of an agreement with Arlington.

The Trustee argues in his motion for reconsideration that he submitted sufficient evidence to create an issue of fact for trial as to why the Gildea Group terminated its negotiations with Comerica and began negotiating with Arlington to obtain an ownership interest in a company succeeding the Debtor. Upon reconsideration, the Court agrees.

According to the affidavit of Michael Peters, a managing member of Arlington, he and another managing member of Arlington met with Steven Gildea, Chris Gildea, and Michael Motter in late February 2003, to discuss a possible investment in the Debtor by Arlington. (Peters Aff. 1, DE 70-34.) On February 27, 2003, Chris Gildea told Werling that he was disappointed in their offer to finance a Gildea Group bid and to accept such a bid at $3.7 million. He said he would not offer a lower number. Taking all inferences to favor the Trustee, the Gildea Group's meeting with Arlington occurred before Chris Gildea's statement to Comerica that they would not offer a lower number. These facts establish that the Gildea Group declined to continue negotiating with Comerica only after meeting with Arlington.

21

Because the Gildea Group cut off negotiations with Comerica only after meeting with Arlington, and because it had been persistently seeking financing from Comerica to purchase the Debtor's assets,  it is reasonable to infer that the decision to spurn Comerica financing and work with Arlington was due to something occurring at the meeting. The Trustee argues that the evidence in this case concerning the intent of the parties at that time and their subsequent actions suggest that what occurred at the meeting was an agreement to work together to control the price at auction. The Court agrees that this is a reasonable inference. As noted by the court in *Trap Rock*, such agreements are obviously not committed to writing. 42 F.3d at 753. The evidence submitted shows that the Gildea Group strongly wanted to purchase the Debtor's assets. Throughout 2002 and into the first part of 2003, the Gildea Group negotiated with Comerica to buy the Debtor's assets, with financing from Comerica. Comerica proposed a sale of the assets for $3.7 million. When Arlington became interested in purchasing the Debtor's assets, the Gildea Group completely stopped negotiating with Comerica and began negotiating with Arlington. Those negotiations involved an ownership role for the Gildea Group. Ultimately, Arlington, by itself, submitted the highest bid at auction, and the Gildea Group did not submit a bid. Immediately following the auction, the Gildea Group purchased the assets from Arlington. A reasonable jury could infer from these facts that the Gildea Group and Arlington reached an agreement to work together rather than bid against each other.

An agreement not to bid against each other would likely have as its intent a desire to influence the sale price at auction. *Sanner*, 218 B.R. at 947 (stating that an agreement by which one party will not bid at auction presents a question of fact for a jury as to whether the intent behind the agreement was to influence the price at auction). Such an agreement would have made economic sense to both parties. By working with Arlington, the Gildea Group neutralized a possible competing bidder and also could hide its interest in the bid. A sale to Arlington for a low price would be less likely to draw objections from creditors who had threatened to block a

sale to the Gildea Group because Arlington was perceived as being independent from the Gildea Group. An agreement entered with the purpose of concealing the Gildea Group's interest in obtaining the Debtor's assets also would likely have as its intent the desire to influence the sale price.  Arlington would benefit from an agreement with the Gildea Group because its bargaining position with Comerica improved by being the only bidder. Also, it had a potential buyer for the assets in the Gildea Group, allowing for a quick sale after auction. Both parties could accomplish their purposes and obtain a lower bid price by agreeing to work together and to not submit independent bids. The events leading up to the sale do not give sufficient reason to doubt that this is actually what happened. Arlington's dealings with the Gildea Group were never disclosed and the Gildea Group never came back to Comerica with a counteroffer.

The Defendants argue that an agreement between the Gildea Group and Arlington would not make sense because if the Gildea Group had financing, it would have submitted its own bid for slightly over the $2.7 million that Arlington bid. This argument ignores the fact that such a bid would have likely provoked strong opposition from the unsecured creditors and from Comerica, both of whom had threatened to block the Gildea Group from purchasing the Debtor's assets too cheaply. Also, the possibility raised by the Defendants—that the Gildea Group might submit an independent bid after Arlington had negotiated a price with Comerica—would be a good reason for Arlington to commit to an agreement with the Gildea Group to prevent competitive bidding. The Defendants state that before the date bids were due, the plan to submit a joint bid fell through. The fact that the Gildea Group did not go back to Comerica to obtain financing for an independent bid could be seen as evidence that there was an agreement between Arlington and the Gildea Group not to submit competing bids.

The Defendants also argue that even if Arlington and the Gildea Group entered an agreement, it could not have controlled the price of the auction sale because Comerica's agreement with Arlington to consent to a sale at $2.7 million controlled the price of the auction

23

at sale. This argument misses the point. An agreement controls the price at auction only if it is entered into with the purpose of influencing the sale price. Arlington and Comerica's agreement set a floor for bidding. One could say that the price at auction was influenced by this agreement by eliminating the possibility of lower bids, but such an agreement, which makes higher bids more likely, is not objectionable under § 363(n). Also, the Defendants argue that "[b]y definition, there can be only one agreement that actually controlled the price at the Auction." (Def. Br. 15, DE 118.) This is incorrect. In a given auction, there could be multiple agreements entered into by potential bidders with the intent to influence the sale price.

Of course, the Gildea Group may have had legitimate reasons for declining Comerica financing, such as distrust from their past dealings as stated by Chris Gildea.[3] Or perhaps there was no agreement between the Gildea Group and Arlington and the Gildea Group independently decided that their interests would be better protected by working with Arlington. If Arlington and the Gildea Group worked together without entering any agreement, the dealings between the Gildea Group and Arlington, including the anticipated joint bid, would be unobjectionable, as the Court noted in its previous opinion. Even if the Defendants were motivated to work together by their desire to obtain a lower bid price, but never entered any agreement between them to further that desire, they would not be liable. However, the fact that the Gildea Group declined financing from Comerica shortly after meeting with Arlington, the fact that the parties could both benefit by working together, the fact that they never disclosed the fact that they had been negotiating, the fact that the Gildea Group never reopened discussions with Comerica, and the fact that f 27

---

[3]The Trustee objects to this statement, arguing that it is inadmissible. However, the statement comes from a transcript of a hearing submitted by the Trustee, who was present and who stated in his affidavit that the transcript was accurate. (Boyer Aff. 6, DE 77; March 5, 2004, Tr. DE 77-19.) In any event, the evidence does not affect the Court's ruling, as the Trustee has submitted sufficient evidence to create an issue of fact as to whether the decision to stop negotiating with Comerica was independent.

Arlington sold its interest in the assets to the Gildea Group shortly after the auction, make the inference that the Defendants agreed to work together with the intent of obtaining a lower bid price more likely.

Finally, the Court's erroneous assumption that the Gildea Group independently declined financing from Comerica justifies reconsidering and vacating its order granting summary judgment on Count V. The Trustee did not present a new theory, and his argument is not completely different in the motion for reconsideration as it was with regard to Count III. Here, he focuses on evidence that the Court overlooked when determining whether a reasonable jury could infer the existence of an agreement to influence the sale price. By reversing itself now, the Court spares the court of appeals and the parties the cost, inconvenience, and delay that would likely result from allowing the judgment to stand.

As to the Trustee's second argument—that the Court has applied the wrong standard for determining whether an inference of collusive conduct is reasonable by requiring the Trustee to establish facts making the inference of collusion more reasonable than an inference of independent action—the issue is moot because the Court agrees that the full context of the parties' dealings makes the inference of collusion more reasonable, and so the issue should be submitted to a jury to determine. The Court notes only that the same logic that motivated the higher standard for anti-trust cases applies to the situation here. The rule prohibiting collusive conduct in bidding is intended to protect creditors by ensuring a competitive bidding situation, resulting in a higher price for assets. The Seventh Circuit has noted that the likeliness of litigation is a factor that negatively affects the willingness of bidders to offer high prices for debtor assets. *Matter of Met-L-Wood Corp.*, 861 F.2d 1012, 1019 (7th Cir. 1988). As in anti-trust cases, mistaken inferences at the summary judgment stage in collusive bidding cases could be "especially costly, because they chill the very conduct the . . . laws are designed to protect." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).

In any event, the issue can be more fully addressed in a different case, because the issue has no further effect in this case. Having found the inference of a collusive agreement to be reasonable on the facts established by the Trustee, it is now for a  jury to determine whether the Defendants entered an agreement with the intent to influence the sale price at auction.

**C.      Motion for Final Judgment under Rule 54(b)**

The Defendants filed a motion for a final judgment on claims III, IV, V, VI, VII, and VIII pursuant to Federal Rule of Civil Procedure 54(b). "The test for separate claims under the rule is whether the claim that is contended to be separate so overlaps the claim or claims that have been retained for trial that if the latter were to give rise to a separate appeal at the end of the case the court would have to go over the same ground that it had covered in the first appeal." *Lottie v. W. Am. Ins. Co.*, 408 F.3d 935, 939 (7th Cir. 2005). Because the Court has granted the Trustee's motion to reconsider Count V, and the facts relevant to Count V are also relevant to Counts III through VIII, the motion for final judgment is denied.

**D.      Conclusion**

The difficulty with this case can perhaps be attributed to the early filing of the motion for summary judgment and the heavily circumstantial nature of the Trustee's claim. No depositions were submitted as evidence. Rather, both parties submitted affidavits and supporting documents, much of it inadmissible, and neither party filed a motion pursuant to Federal Rule of Civil Procedure 56(f) to reopen discovery before ruling on the motion for summary judgment as to Claim V. In any event, there has been sufficient evidence submitted for a reasonable jury to find for the Trustee on Counts I, II, and V, and so, a jury trial is necessary on those counts.

**ORDER**

For the reasons stated, Chris Gildea's motion for summary judgment on Count II [DE 69] is DENIED. The Trustee's motion to alter judgment with regard to Count V [DE 114] is GRANTED, and the Court's October 5, 2006, Opinion and Order granting summary judgment on the Trustee's Count V against Arlington Capital, GT/E, Chris Gildea, Katherine Gildea, Mike Motter, and Matt Mercer is VACATED. The Defendants' motion for entry of judgment [DE 119] is DENIED.

A telephone conference in this matter is SET for August 30, 2007, at 2:00 PM.

SO ORDERED on August 24, 2007.

   /s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT