# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| R. DAVID BOYER, TRUSTEE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:05-CV-129-TLS |
| | ) | |
| CHRISTOPHER GILDEA et. al, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Presently before the Court are motions for summary judgment and motions to strike by the Defendants as to Count III of the Second Amended Complaint [ECF No. 183], along with a motion by the Plaintiff to strike the Defendants' Count III motions for summary judgment. This Opinion and Order addresses all motions relating to Count III of the Second Amended Complaint, which are the last remaining outstanding motions in this case.

On December 8, 2008, this Court entered an Opinion and Order [ECF No. 181] allowing the Plaintiff to amend his complaint by filing a Second Amended Complaint incorporating evidence gathered through discovery and a new claim for attorney's fees. On April 17, 2009, Defendants GT Enterprises LLC, Christopher Gildea, Katherine Gildea, Mike Motter, and Matt Mercer ("GT Defendants") filed a Motion for Summary Judgment on Count III of Trustee's Second Amended Complaint [ECF No. 208], along with a Brief in Support [ECF No. 209], a Statement of Material Facts [ECF No. 210], and an Appendix of Designated Documents [ECF No. 211]. Also on April 17, Defendant Arlington Capital, LLC filed a Motion for Summary Judgment on Count III of the Trustee's Second Amended Complaint [ECF No. 212], along with a Brief in Support [ECF No. 213], a Statement of Material Facts [ECF No. 214], and an Appendix of Designated Evidence [ECF No. 215]. On May 18, the Plaintiff responded with a Memorandum of Law in Opposition [ECF No. 222] which addressed both Count III summary

judgment motions, along with a Response to Defendants' Statements of Material Facts and Statement of Genuine Issues [ECF No. 223], and an Appendix of Additional Evidence [ECF No. 224]. On June 2, Defendant Arlington Capital filed a Reply [ECF No. 227] with respect to the Count III motion, and the GT Defendants filed a Reply [ECF No. 236] with respect to the Count III motion. Also on June 2, Defendant Arlington Capital filed a Motion to Strike Certain Statements that the Trustee Makes and Certain Evidence that the Trustee Cites in Support of his Opposition to Defendant Arlington Capital, LLC's Motion for Summary Judgment on Count III of Trustee's Second Amended Complaint [ECF No. 225], along with a Brief in Support [ECF No. 226], and the GT Defendants filed a Motion to Strike Certain Statements that the Trustee Makes and Certain Evidence that the Trustee Cites in Support of His Opposition to Defendants' Motion for Summary Judgment on Count III of Trustee's Second Amended Complaint [ECF No. 234], along with a Brief in Support [ECF No. 235]. On June 17, the Plaintiff filed a Memorandum of Law in Opposition to Defendants' Motions to Strike [ECF No. 239] relating to Count III, along with a Declaration of John G. McCarthy [ECF No. 240]. On June 24, the GT Defendants filed a Reply [ECF No. 243], and on June 26, Defendant Arlington Capital filed a Reply [ECF No. 244].

Additionally, on April 27, 2009, the Plaintiff filed a Motion for an Order Striking or Summarily Denying Defendants' Motions Addressed to Count III [ECF No. 216]. On May 12, the GT Defendants and Defendant Arlington Capital both filed Responses [ECF Nos. 217 & 218]. For the following reasons, the Court will deny the Defendants' Motions for Summary Judgment with respect to Count III of the Second Amended Complaint.

## BACKGROUND

The Court has previously outlined the history of this case in its October 5, 2006, Opinion [ECF No. 112], its August 24, 2007, Opinion [ECF No. 124], its November 5, 2007, Order and

Opinion [ECF No. 137], its December 8, 2008, Opinion and Order [ECF No. 181], and its February 21, 2012, Opinion and Order [ECF No. 258]. In the interest of completeness, the Court will supplement and update the case history.

This case arose out of the bankruptcy of GT Automation Inc. (the Debtor). Steven Gildea was the president of the Debtor and sole equity owner. Defendant Anita Gildea is Steven Gildea's wife. Steven and Anita Gildea were the only directors of the Debtor. Defendant Christopher Gildea, Steven and Anita Gildea's son, was an officer of the Debtor. Christopher Gildea also owned Defendant Gasson, LLC, which leased equipment to the Debtor. Defendant Katherine Gildea is Christopher Gildea's wife.

The Debtor filed for bankruptcy on October 9, 2001, and the bankruptcy court allowed the Debtor to continue operating as a debtor-in-possession. Comerica was the Debtor's largest secured creditor and held a first priority security interest and lien on all of its assets. Comerica filed a proof of claim in the bankruptcy proceedings for $7,818,406.10.

During the bankruptcy, Defendant Christopher Gildea and other Gildea family members and officers of the Debtor (the Gildea Group) made efforts to secure financing to purchase the Debtor's assets. There were negotiations between the Gildea Group and Comerica from the summer of 2002 until sometime in early 2003. The Gildea Group also began meeting with Defendant Arlington Capital in February 2003. On February 12, 2003, the Debtor moved for an order authorizing an auction of the Debtor's assets. The Gildea Group sought to purchase the Debtor's assets. The bankruptcy court issued an order allowing an auction of the Debtor's assets pursuant to 11 U.S.C. § 363, subject to conditions agreed to by the Debtor and its creditors.

The auction for the Debtor's assets was held on April 3, 2003. Defendant GTA Acquisition, LLC submitted a bid of $2,725,000, which was the highest bid. The only other bid was a credit bid submitted by Comerica. Defendant GTA Acquisition was an entity created by Defendant Arlington Capital on or about April 1 for the purpose of acquiring the Debtor's assets.

Defendant Arlington also formed GTA Realty, LLC for the purpose of taking title to the Debtor's real estate. After holding a hearing on April 7, the bankruptcy court, on April 8, approved the sale of the Debtor's assets to Defendant GTA Acquisition. On April 16, 2003, an amended sale order was issued. There were no objections to the sale.

Pursuant to a Buyout Agreement dated April 7, 2003, Defendant GT Enterprises, LLC (Defendant GT/E) acquired Defendant GTA Acquisition. Defendant GT/E was formed and is owned by Defendants Katherine Gildea, Mike Motter, and Matt Mercer. Defendant Matt Mercer was a Vice President of the Debtor. Defendant Mike Motter was the Debtor's accountant.

This case was filed on April 7, 2004. The Plaintiff's Complaint stated claims against Defendants Christopher Gildea, Katherine Gildea, Michael Motter, Matt Mercer, Anita Gildea, Arlington Capital, LLC, GT Acquisition, LLC, GT/E, LLC, Gasson, LLC, and Gildea & Gorman, LLC. An Amended Complaint was filed on October 18, 2004, containing eight counts.

In its Opinion of October 17, 2005, the Court granted summary judgment to Defendant Arlington Capital on the Plaintiff's state law claims against it (Counts VI to VIII of the Amended Complaint), finding the bankruptcy court's April 16, 2003, Amended Sale Order precluded such claims. (Opinion, ECF No. 49.) The Court stated that the state law claims could be brought only if the Amended Sale Order was set aside. In response, the Plaintiff brought a separate case alleging fraud on the court and seeking to alter the Amended Sale Order. *Boyer v. GT Acquisition*, 1:06-CV-90 (N.D. Ind. filed March 22, 2006). The bankruptcy court declined to provide the relief sought by the Plaintiff, stating that granting the requested relief probably would not remove the preclusive effect of the Amended Sale Order, and holding that a judgment that is alleged to have been obtained by fraud on the court cannot be amended, it must be vacated. The Plaintiff appealed, and this Court agreed with the bankruptcy court as stated in its Opinion and Order of August 9, 2007. *Boyer v. GT Acquisition LLC*, No. 1:06-CV-90-TS, 2007 WL 2316520 (N.D. Ind. Aug. 9, 2007).

In its Opinion of October 5, 2006, the Court denied summary judgment on Count I of the Amended Complaint, granted summary judgment on Counts III, IV, and V of the Amended Complaint, and withheld ruling on Count II of the Amended Complaint pending further briefing. (Opinion, ECF No. 112.) Counts I and II sought to set aside transfers of Debtor funds to Defendant Christopher Gildea, and Count III was to set aside a transfer of Debtor funds to Gildea & Gorman, LLC. Count IV was a state law claim alleging that Defendants Mike Motter and Christopher Gildea breached their fiduciary duties to the Debtor. Count V alleged that Defendants Arlington Capital, GT/E, Christopher Gildea, Katherine Gildea, Mike Motter, and Matt Mercer colluded to control the price of the Debtor's assets at the auction sale.

In its Opinion of August 24, 2007, the Court denied summary judgment on Count II of the Amended Complaint. (Opinion, ECF No. 124.) The Court additionally granted the Plaintiff's Motion to Alter its previous decision with respect to Count V of the Amended Complaint, vacating its previous Order granting summary judgment on Count V.

In its Order and Opinion of November 5, 2007, the Court certified its previous Opinion of August 24, 2007, for interlocutory appeal (Order & Opinion, ECF No. 137), but the United States Court of Appeals for the Seventh Circuit denied the petition for interlocutory appeal. (Appellate Order, ECF No. 144.)

In its Opinion and Order of December 8, 2008, the Court granted the Plaintiff's request to file a Second Amended Complaint. (Opinion & Order, ECF No. 181.) The Second Amended Complaint includes four counts, the first three of which are functionally equivalent to Counts I, II and V of the Amended Complaint, with some additional factual allegations. Count I seeks to avoid the transfer of $170,000 from the Debtor to Defendant Christopher Gildea which the Plaintiff claims was setoff without approval of the bankruptcy court. Count II seeks to avoid more than $30,000 of the Debtor's payments to Defendant Christopher Gildea which the Plaintiff claims were not in the ordinary course of business. Count III alleges that Defendants Arlington

Capital, GT/E, Christopher Gildea, Katherine Gildea, Mike Motter and Matt Mercer colluded to control the price of the Debtor's assets at the auction sale. Finally, Count IV is a request for attorney's fees.

In its Opinion and Order of February 21, 2012, the Court denied summary judgment to Defendants Gasson, LLC and Christopher Gildea on their Second Amended Complaint Count I motion, and denied summary judgment to Defendant Christopher Gildea on his Second Amended Complaint Count II motion. (Opinion & Order, ECF No. 258.)

This Opinion and Order addresses all motions relating to Count III of the Second Amended Complaint.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the facts supported by materials in the record show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. The motion should be granted so long as no rational fact finder could return a verdict in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* N.D. Ind. L.R. 56.1(a) (stating that the movant must provide a "Statement of Material Facts" that identifies the facts that the moving party contends are not genuinely disputed). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed in Rule 56 to designate specific material facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Insolia v. Philip*

*Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000); N.D. Ind. L.R. 56.1(b) (directing that a response in opposition to a motion for summary judgment must include "a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary"). According to Rule 56:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp*., 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting the often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. "Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute." *Harney v. Speedway SuperAmerica, LLC,* 526 F.3d 1099, 1104 (7th Cir. 2008).

Under Federal Rule of Civil Procedure 56(c)(4), any affidavit or declaration "used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." On a motion for summary judgment, a court must disregard parts of an affidavit that fail to comply with this rule. *Cooper-Schut v. Visteon Auto.*

*Sys.*, 361 F.3d 421, 429 (7th Cir. 2004); *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987). The following statements do not comply with the rule and should be disregarded: "(1) conclusory allegations lacking supporting evidence; (2) legal argument; (3) self-serving statements without factual support in the record; (4) inferences or opinions not grounded in observation or other first-hand experience; and (5) mere speculation or conjecture." *Heltzel v. Dutchmen Mfg., Inc.*, No. 3:06-CV-227, 2007 WL 4556735, at *4 (N.D. Ind. Dec. 20, 2007) (quotation marks and citations omitted). Although "self-serving statements in affidavits without factual support in the record carry no weight," *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) (emphasis omitted), "a self-serving affidavit supported by facts in the record [can] defeat summary judgment," and the record "may include the self-serving affidavit itself, provided that the affidavit meets the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was a genuine issue for trial," *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir. 2004) (quotation marks and citations omitted).

## ANALYSIS

### A.    Count III of the Second Amended Complaint

In Count III, the Plaintiff alleges that Defendants Arlington Capital, GT/E, Christopher Gildea, Katherine Gildea, Mike Motter, and Matt Mercer colluded to control the price at the auction for the Debtor's assets.

### 1.    *Facts and Evidence Relevant to Count III*

Due to the multiple motions and briefs filed regarding what is now Count III of the Second Amended Complaint, an in-depth recitation of the Court's previous rulings and rationales for those rulings is appropriate. Further, the Court will set out and summarize the

evidence relied upon by the parties now that discovery is complete.

After the Debtor filed for bankruptcy, Defendant Christopher Gildea and other Defendants made several attempts to obtain financing in order to purchase the assets of the Debtor. But Defendants Christopher Gildea, Katherine Gildea, Mike Motter, and Matt Mercer did not bid on the assets of the Debtor when they went up for auction on April 3, 2003. Defendant Arlington Capital was the only bidder apart from Comerica's credit bid. The bankruptcy court held a hearing on the auction sale on April 7, 2003, and entered an order approving the sale on April 8. In a document dated April 7 and signed by Defendants Mike Motter and Christopher Gildea, Defendant GT/E (owned by Defendants Katherine Gildea, Mike Motter, and Matt Mercer) agreed to purchase the Debtor's assets from Defendant Arlington Capital.[1] The Plaintiff averred in his Amended Complaint that Defendants Arlington, GT/E, Christopher Gildea, Katherine Gildea, Mike Motter, and Matt Mercer were potential bidders within the meaning of § 363(n) who colluded to control the price at auction. The Defendants denied that any agreement existed and argued that even if an agreement had existed, it could not have been intended to control the price at auction because the GT Defendants did not have financing to submit a competitive bid. In its October 5, 2006, Opinion, the Court agreed with the Defendants. Regarding the timing of an alleged agreement, the Court stated as follows:

> The timing of the agreement between Arlington and the GT insiders, and the extensive negotiations between them leading up to the sale, do not add support to the Plaintiff's case, as they are consistent with the Defendants' assertion that they did not enter an agreement until after the close of bidding.

*Boyer v. Gildea*, No. 1:05-CV-129-TLS, 2006 WL 2868924, at *15 (N.D. Ind. Oct. 5, 2006). Regarding the ability of the GT Defendants to submit a competitive bid, the Court stated:

---

[1]The agreement states that Defendant GT/E is purchasing Defendant GTA Acquisition from Defendant Arlington Capital, and states that Defendant Arlington is the "only member" of Defendant GTA Acquisition. (Buyout Agreement, ECF No. 215-13 at 25–32.)

The Plaintiff's allegation that the Defendants agreed to collude to avoid bidding against each other makes little sense in light of the Gildea group's failure to obtain financing to make an independent bid. The Gildea group obtained financing of about $1.4 million, which is what they offered in the initial sale motion, filed in February 2003. This is substantially less than the $2.75 million bid that Arlington submitted. Significantly, months after the contract was entered into, the Gildea group still could not obtain sufficient financing to pay off the $2.1 million remaining on the note to Arlington. GT/E paid $617,000 for the personal property of the Debtor and obtained another $600,000 loan. This is also far less than the amount they would have needed to submit a competitive bid. Because the Gildea group could not offer a competitive bid, it is not reasonable to infer that Arlington and the Gildea group colluded to avoid bidding against each other.

*Id.*, at *16. Accordingly, the Court's October 5, 2006, Opinion granted summary judgment to the Defendants on this count. However, the Plaintiff filed a motion to reconsider, and in an August 24, 2007, Opinion, the Court reversed itself, denying the Defendants summary judgment on this count. The Court explained that the Plaintiff had solidified the inference of collusion with evidence that the GT Defendants discontinued their vigorous pursuit of financing to purchase the assets of the Debtor only after beginning to meet with Defendant Arlington Capital, and with evidence that the GT Defendants had the possibility of obtaining financing sufficient to submit a competitive bid. Specifically, the Court stated as follows:

According to the affidavit of Michael Peters, a managing member of Arlington, he and another managing member of Arlington met with Steven Gildea, Chris Gildea, and Michael Motter in late February 2003, to discuss a possible investment in the Debtor by Arlington. (Peters Aff. 1, DE 70-34.) On February 27, 2003, Chris Gildea told Werling [from Comerica] that he was disappointed in their offer to finance a Gildea Group bid and to accept such a bid at $3.7 million. He said he would not offer a lower number. Taking all inferences to favor the Trustee, the Gildea Group's meeting with Arlington occurred before Chris Gildea's statement to Comerica that they would not offer a lower number. These facts establish that the Gildea Group declined to continue negotiating with Comerica only after meeting with Arlington.

Because the Gildea Group cut off negotiations with Comerica only after meeting with Arlington, and because it had been persistently seeking financing from Comerica to purchase the Debtor's assets, it is reasonable to infer that the decision to spurn Comerica financing and work with Arlington was due to something occurring at the meeting. The Trustee argues that the evidence in this case concerning the intent of the parties at that time and their subsequent actions suggest

10

that what occurred at the meeting was an agreement to work together to control the
price at auction. The Court agrees that this is a reasonable inference.

*Boyer v. Gildea*, 374 B.R. 645, 659–60 (N.D. Ind. 2007). The Court concluded its analysis

finding that an inference of collusion was reasonable by stating:

> [T]he fact that the Gildea Group declined financing from Comerica shortly after
> meeting with Arlington, the fact that the parties could both benefit by working
> together, the fact that they never disclosed the fact that they had been negotiating, the
> fact that the Gildea Group never reopened discussions with Comerica, and the fact
> that Arlington sold its interest in the assets to the Gildea Group shortly after the
> auction, make the inference that the Defendants agreed to work together with the
> intent of obtaining a lower bid price more likely.

*Id.* at 661.

The GT Defendants and Defendant Arlington again challenge the Plaintiff's claim that

they colluded to control the price at auction. The Defendants, in functionally congruent briefs,

argue first, that Comerica's rights as an undersecured creditor negate the elements of a § 363(n)

claim; second, that the Plaintiff has not produced evidence to raise even the inference that an

agreement existed between Defendant Arlington and the GT Defendants prior to the auction sale,

and that if the Court found such an inference to exist it would be negated by the GT Defendants'

legitimate business reasons for declining financing from Comerica in early March 2003; and

third, that the Plaintiff has not produced evidence showing the value of the Debtor's assets on the

date of the sale.

In support, the Defendants submit three different offers tendered by the GT Defendants to

Comerica from December 3, 2002, to January 6, 2003. (C. Gildea Aff., ECF No. 215-8 at 8–20.)[2]

All three are efforts by the GT Defendants to obtain financing and purchase the assets of the

Debtor. The Defendants also submit many documents from Comerica's records to support their

argument that Comerica considered the GT Defendants' January 6 offer over the course of nearly

---

[2]All documents attached to ECF No. 215 are also attached to ECF No. 211. The Court will direct
all citations to ECF No. 215.

two months before communicating a counter-offer in a March 3 fax (Zarb Dep. I & Exhibits, ECF No. 215-9; Zarb Dep. II & Exhibits, ECF No. 215-22; Shaya Dep. & Exhibits, ECF Nos. 215-11 & 215-12; Werling Dep. 258–59, ECF No. 215-15; Motter Aff. Ex. 47, ECF No. 215-13 at 9–12), documents showing that by December 2002, Comerica was controlling the Debtor's use of its cash collateral account (Zarb Dep. I 40–41; Burns Dep. 144–45, ECF No. 215-7; Cash Collateral Order, ECF No. 215-18), and affidavit and deposition testimony by the Defendants asserting that the terms of Comerica's March 3 proposal were financially impossible to accept due to the poor financial condition of the Debtor, and were also unpalatable due to the breakdown of the relationship between the Debtor and Comerica by early 2003 (Motter Aff.; Motter Dep., ECF No. 215-19; Christopher Gildea Aff., ECF No. 215-8; Christopher Gildea Dep., ECF No. 215-17). Specifically, Defendant Christopher Gildea states in his affidavit that on March 3 there was no offer from Greenfield Commercial Credit to loan money using the Debtor's accounts receivable as collateral, and thus accepting the terms as stated in the March 3 fax would have been impossible. (C. Gildea Aff. ¶ 24.) The Defendants identify specific documents they claim are insufficient to establish the value of the Debtor's assets on the date of the auction, including a letter dated August 15, 2003, from Defendant Christopher Gildea to First Federal Bank of Huntington which states that the assets purchased in the auction were worth $5 million (Letter, ECF No. 80-2), and a financial analysis by Bill Badie of Defendant Arlington stating that the "Net Gains" on purchasing the Debtor's assets would be $1,013,000, to be allocated between Defendant Arlington and the GT Defendants (Arlington Offer, ECF No. 224-18 at 1). The Defendants argue, largely by reference to Defendant Motter's affidavit and accompanying exhibits, that in early 2003 the Debtor was losing money, had no use of its cash collateral, was effectively on its deathbed, and therefore a proper valuation of the Debtor's assets at the time of the auction is liquidation value. (Motter Aff. Ex. F, ECF No. 215-13 at 17–24.) Finally, the Defendants offer in full the Plaintiff's Objections and Responses to Defendant

Arlington Capital LLC's First Set of Interrogatories, filed on September 29, 2008, to support their argument that the Plaintiff's estimation of damages has been inconsistent. (ECF No. 215-10.)

The Plaintiff responds to the Defendants' contentions by arguing, first, that the Court's previous analysis finding an inference of collusion between Defendant Arlington and the GT Defendants was correct; second, that the inference of collusion is strengthened by new evidence that the GT Defendants had actually *submitted* the offer which Comerica approved in the March 3 fax, showing that Comerica agreed to provide the GT Defendants financing to submit a competitive bid; third, that the plain language of § 363(n) provides for claims whether the secured creditor is in an undersecured position or not; fourth, that Comerica's credit bid at the auction is not determinative of fair market value of the Debtor's assets because Comerica had many reasons for submitting that bid; fifth, that significant admissible evidence exists to show that the value of the Debtor's assets on the date of the auction exceeded the auction price; and sixth, that the Court should sanction the Defendants under 28 U.S.C. § 1927 for unreasonably and vexatiously multiplying these proceedings.

In support, the Plaintiff relies on the Amended Plan Offer, submitted by Defendant Motter in July 2002, previously discussed by this Court and found to be admissible, which proposes Comerica financing a purchase of the Debtor's assets by Steven Gildea, Joe Siela, and Defendants Christopher Gildea and Matt Mercer. (Opinion & Order 12–13, ECF No. 258; Werling Aff. Ex. A, ECF No. 82-2.) The Plaintiff also submits, or directs the Court, to the following evidence: deposition testimony by Ernest Zarb, a senior vice president at Comerica, suggesting that the financing plan approved by Comerica on February 13, 2003, and communicated to the GT Defendants in the March 3 fax was actually an offer *from* the GT Defendants to Comerica, communicated by Defendant Christopher Gildea and/or Steven Gildea two to three weeks prior to February 13 (Zarb Dep. 72, ECF No. 224-2); deposition testimony by

Zarb indicating that by February 5, 2003, Bill Badie from Arlington was calling and was "very interested" in purchasing the Debtor's assets (Zarb Dep. 149–50; Note, ECF No. 224-20 at 3); deposition testimony from Defendant Matt Mercer suggesting that from the beginning of the GT Defendants' association with Defendant Arlington, he viewed Defendant Arlington as a partner and not a competing bidder (Mercer Dep. 30–31, ECF No. 224-3); deposition testimony from Defendant Motter that recounts a meeting between executives of Defendant Arlington including Bill Badie and some of the GT Defendants including Christopher Gildea and Matt Mercer where Defendant Motter describes the meeting as occurring around February 27, 2003, but admits he was employed by the accounting firm of BKD and would have billed for his time (Motter Dep. 36–37, ECF No. 224-7); a BKD time report for Defendant Motter for the period ending February 15, 2003, indicating Defendant Motter met with Bill Badie on February 11, 2003, and billed his time to the Debtor (BKD Time Report, ECF No. 224-13 at 4); additional deposition testimony by Zarb, and the same exhibits relied upon by the Defendants, indicating that sometime between Comerica's February 13 approval of the GT Defendants' financing proposal and February 28, the GT Defendants revoked their offer (Zarb Dep. 191; Zarb Dep. I Exs. G & V, ECF No. 215-9 at 22–37, 39–56); Exhibit V to the Zarb Deposition—one of the exhibits submitted by the Defendants—suggesting that after the GT Defendants revoked the offer in late February, negotiations between the GT Defendants and Comerica continued (Zarb Dep. I Ex. V, ECF No. 215-9 at 47 (March 4 entry describing "[t]he new Gildeas' offer")); Exhibit G to the Zarb Deposition—also submitted by the Defendants—showing that on or about January 16, 2003, Steven Gildea submitted a financial statement to Comerica which was considered as part of Comerica's February 13 risk rating and recommendation to finance the GT Defendants (Personal Financial Statement, ECF No. 215-9 at 37); deposition testimony by Defendant Motter along with a time line of events created by Defendant Motter showing that he was informed he would be leaving BKD on December 31, 2002, and that "some discussions had begun" about Defendant

Motter joining the Debtor prior to the February meeting between Defendant Arlington and the GT Defendants (Motter Dep. 38–39, ECF No. 224-7; Motter Time Line 2–3, ECF No. 224-11); Mark Werling's affidavit testimony that he communicated with Defendant Christopher Gildea in a phone call on February 27, 2003, and that Defendant Christopher Gildea acknowledged the current price "under discussion with Comerica" was $3.7 million, but expressed disappointment that Comerica had not responded sooner and therefore declined to pay $3.7 million (Werling Aff. ¶ 22, ECF No. 82); a Baker & Daniels invoice to Comerica showing that Werling had an 18 minute phone conversation with "C. Gildea on behalf of new LLC re offer" on February 27, 2003 (Invoice, ECF No. 224-15); deposition testimony by Defendants Motter and Mercer that they were aware of Comerica's offer to finance a purchase of the Debtor's assets for $3.7 million (Motter Dep. 48, ECF No. 224-7; Mercer Dep. 42); a letter dated February 18, 2003, from Defendant Arlington to Zarb offering $1.4 million for the assets of the Debtor (Letter, ECF No. 224-21); a letter dated February 21, 2003, from Defendant Arlington to Zarb offering $2.2 million for the assets of the Debtor (Letter, ECF No. 224-22); a memorandum suggesting Defendant Arlington increased the offer to $2.55 million sometime before February 26 (Memo, ECF No. 224-23); Exhibit V to the Zarb Deposition showing that Defendant Arlington's offer increased to $2.7 million by February 28, 2003, and to $2.725 million by April 2 when Comerica and Defendant Arlington reached a final agreement (Zarb Dep. I Ex. V, ECF No. 215-9 at 46–47); deposition testimony from attorney Robert Nicholson, who was representing Defendant Arlington at the time, indicating that some or all of the GT Defendants met with representatives from Defendant Arlington on March 4, 2003, to discuss "strategy" (Nicholson Dep. 23, ECF No. 224-6); the transcript of the March 5, 2003, hearing before the bankruptcy court—submitted by the Defendants—during which representatives of the Committee of Unsecured Creditors objected to a sale because they saw the GT Defendants as likely to defeat the interests of the unsecured creditors, and during which a Comerica representative stated that Comerica would

15

block the GT Defendants from cheaply purchasing the Debtor's assets at auction, and referred to the bid submitted by Defendant Arlington as "a non-inside bid" (*See* Transcript, ECF No. 215-6); evidence that Nicholson met with "GT Automation personnel re structure of possible investment" on March 7, 2003 (March 31, 2003, Invoice, ECF No. 224-10); a May 28, 2004, letter from W. Randall Kammeyer, an attorney representing the GT Defendants, indicating—via Defendant Motter—that during the March 7 meeting between the GT Defendants and Defendant Arlington "Motter and the group proposed a 30/70% ownership with the management team owning 70%. Arlington immediately responded with the exact opposite counteroffer." (Letter ¶ 6, ECF No. 82-7); a series of documents (previously referenced above), some dated March 7, 2003, indicating that Bill Badie of Defendant Arlington projected $1.013 million in net gains on the purchase of the Debtor's assets, to be divided $517,000 to Defendant Arlington and $496,000 to the GT Defendants, and valuing the "Total Assets" of the Debtor at $3.4 to $4.1 million (Arlington Offers, ECF No. 224-18; Badie Dep. 67–68, ECF No. 224-5); a March 11, 2003, email from Defendant Motter to representatives of Defendant Arlington discussing the continuing negotiations toward an agreement (Motter Email, ECF No. 224-16); deposition testimony from Zarb and Exhibit G to his deposition indicating that the liquidation value of the Debtor's assets was approximately $3.1–3.2 million, that the true value of the collateral was $4.895 million, and that Comerica allowed Defendant Arlington to purchase the Debtor's assets for $2.725 million because of a desire to preserve jobs in the community, because it viewed Defendant Arlington's bid as a stalking horse bid which it hoped would stir up other potential bidders, and because "cash is king" (Zarb Dep. 127–28, 148–49, 193–95; Zarb Dep I Ex. G, ECF No. 215-9 at 35); an email dated March 28, 2003, from Defendant Arlington (through Nicholson) to Defendant Motter with an attached draft of the Buyout Agreement that was ultimately signed between Defendant Arlington and the GT Defendants indicating that it was to be an agreement between Defendant Arlington, "_____, an Indiana limited liability company

('_____'), and GT Holdings, LLC" (Nicholson Aff. ¶ 8, ECF No. 70-35; Buyout

Agreement Draft, ECF No. 70-36); the final Buyout Agreement dated April 7—also submitted

by the Defendants—requiring the GT Defendants "not to discuss the terms of the Buyout with

any third parties" (Buyout Agreement ¶ 5, ECF No. 215-13 at 27); deposition testimony by

Defendant Motter plus the Buyout Agreement to show that the GT Defendants paid $300,000 to

Defendant Arlington contemporaneously with execution of the Buyout Agreement and that the

"Buyout Price" of $517,000 to be paid to Defendant Arlington was the same as the share of the

net gain allocated by Badie to Defendant Arlington in his March 2003 calculations (Motter Dep.

27, ECF No. 224-7; Buyout Agreement ¶¶ 3.1–3.2, ECF No. 215-13 at 26); an April 9, 2003,

email from Defendant Motter to Nicholson proposing changes to the Buyout Agreement, and

referring to the "initial identified gain of $1,013,000" (Email and Attachment ¶ 4.3, ECF No.

224-9); Exhibit G to Zarb's Deposition indicating that the Debtor's real estate was appraised at

$2.395 million in May 2002, a value similar to the $2.4 million real estate valuation assigned by

Badie in his March 2003 spreadsheets (Zarb Dep I Ex. G, ECF No. 215-9 at 35; Arlington

Offers, ECF No. 224-18; Zarb Dep. 148); a Worden Group Appraisal of the Debtor's real estate

dated May 23, 2003, valuing the real estate at $2.050 million (Appraisal, ECF No. 80-5 at 3); a

letter dated August 15, 2003, from Defendant Christopher Gildea to First Federal Bank of

Huntington (previously referenced above) which states that the assets purchased in the auction

were worth $5 million (Letter, ECF No. 80-2 at 3); a statement by Nicholson from a transcription

of a March 5, 2004, meeting, where Nicholson states that Defendant Arlington was not

"interested in buying a big pile of metal" (Meeting Notes 7, ECF No. 77-19); a loan

document—submitted by the Defendants—showing that on January 16, 2003, Steve Gildea,

Anita Gilda, Defendant Christopher Gildea, Joe Siela and Defendant Mercer entered a loan

commitment with the Fort Wayne Community Development Corporation for $250,000, which

was contingent on their obtaining additional funding within a six month period, and which

contemplated their receiving $1 million from Greenfield Capital Corporation (CDC Loan Commitment, ECF No. 215-8 at 21–28); deposition testimony by Defendant Christopher Gildea that Greenfield Commercial Credit approved a loan to some of the GT Defendants in November 2002 (C. Gildea Dep. 24); Exhibit G to Zarb's Deposition showing that the proposal approved by Comerica on February 13, 2003, contemplated that the Debtor's accounts receivable be "factored to Greenfield" (Zarb Dep. I Ex G, ECF No. 215-9 at 26); deposition testimony by Steven Gildea in the bankruptcy case where he states that he and Defendant Motter, Defendant Christopher Gildea, Joe Siela and Anita Gildea were approved for partial financing to purchase the Debtor's assets by Huntington Savings Bank (Steven Gildea Dep. 88, ECF No. 221-2); the Debtor's ledger showing that trade accounts receivable dipped below $300,000 on March 10, 2003, but then had rebounded to over $628,000 by April 10 (Ledger, ECF No. 224-14 at 6–7; Sales Transaction Spreadsheet, ECF No. 224-17); and affidavit testimony by Werling suggesting that at the time of the March 5 hearing there was speculation that insiders of the Debtor were withholding sale orders to depress the apparent market value of the Debtor's assets until after a sale (Werling Aff. ¶ 32).

2.      *The Defendants' Motions to Strike*

The Defendants have moved to strike portions of the Plaintiff's Response to Statements of Material Facts and the Plaintiff's Memorandum of Law in Opposition. Because the Court finds enough admissible evidence to overcome summary judgment, the Court will here analyze the Defendants' arguments for striking only insofar as they are necessary to decide the motion for summary judgment.[3]

---

[3]For those portions of the Motions to Strike [ECF Nos. 225 & 234] that address evidence not material to the outcome of the Motions for Summary Judgment, the Court will deny the Motions to Strike as moot.

a.      *Bill Badie's Statement of the Net Profit on Purchase*

The Defendants argue that the series of documents containing Arlington Capital's offer for the GT Defendants to participate with Defendant Arlington in the purchase of the Debtor's assets [Arlington Offer, ECF No. 224-18] is inadmissible. They argue that the documents are unauthenticated, and are hearsay. The Plaintiff makes no response to the Defendants' arguments except to suggest that the Arlington Offer is "redundant evidence supporting a particular fact." (Pl.'s Mem. of Law Opp'n Defs.' Mot. to Strike 10, ECF No. 239.) The Court notes that the Plaintiff offered the documents to show that Bill Badie of Arlington calculated that the net profit on purchase for Defendant Arlington and the GT Defendants would be $1,013,000. At his deposition, Badie confirmed that the $1,013,000 figure appearing in the first page of the Arlington Offer was based on his own calculation. Accordingly, while the Plaintiff has failed to show that the Arlington Offer documents contained in ECF No. 224-18 are authentic or nonhearsay, the Court will deny the Motions to Strike with respect to Badie's statement that the anticipated net profit on purchase for Defendant Arlington and the GT Defendants was $1,013,000. The Motions to Strike will be granted with respect to the remainder of the contents of the Arlington Offer documents. If the Plaintiff can lay a proper foundation for the Arlington Offer documents at trial, the Court will reconsider the Motions to Strike.

b.      *Defendant Motter's April 9, 2003, Email and its Attachment*

The Defendants argue that the email [Email and Attachment, ECF No. 224-9] sent by Defendant Motter to representatives of Defendant Arlington on April 9, 2003, is unauthenticated, and Defendant Arlington argues it is hearsay as to Arlington. The Plaintiff responds that Defendant Motter authenticated the email and the attachment at his deposition. The Plaintiff does not respond to Defendant Arlington's hearsay argument, and does not argue that the email and its attachment are statements of a coconspirator admissible under Rule 801(d)(2)(E). The Court

agrees with the Plaintiff that Defendant Motter's deposition transcript appears to lay a foundation authenticating the email and its attachment. (*See* Motter Dep. 147–48, ECF No. 240-3.) However, the Court finds that the email is hearsay as to Defendant Arlington although it is a statement of a party opponent against Defendant Motter. *See Corner Pocket of Sioux Falls, Inc. v. Video Lottery Techs., Inc.*, 979 F. Supp. 1269, 1283 (D.S.D. 1996) (admission by a party opponent is "not evidence against any other party in the case") (quotation marks omitted); Fed. R. Evid. 801(d)(2). Accordingly, the Motions to Strike will be granted as to Defendant Arlington, and the Court will not consider Defendant Motter's contemplated "initial identified gain of $1,013,000" as against Defendant Arlington. But consistent with the holding above, Badie's calculation of a $1,013,000 net profit on purchase for the Defendants is admissible as to all Defendants. As above, if the Plaintiff can lay a proper foundation for the email and its attachment at trial, the Court will reconsider the Motions to Strike.

c.      *Mark Werling's Affidavit, Paragraph 22*

Defendant Arlington argues that Paragraph 22 of Mark Werling's Affidavit, concerning a conversation with Defendant Christopher Gildea on February 27, 2003, is hearsay as to Defendant Arlington. The Plaintiff responds that the statements attributable to Defendant Christopher Gildea are not hearsay under Rule 801(d)(1), 801(d)(2)(A), and 801(d)(2)(E). In the alternative, the Plaintiff argues Defendant Christopher Gildea's statements should be admissible against Defendant Arlington under Rule 807. Defendant Arlington replies that Rule 801(d)(1) is inapplicable, that Rule 801(d)(2)(A) admissions by Defendant Christopher Gildea are not admissible against Defendant Arlington, *see Corner Pocket*, 979 F. Supp. at 1283, and that the Plaintiff has not shown why Rule 801(d)(2)(E) or Rule 807 should apply. The Court agrees with Defendant Arlington that Rule 801(d)(1) appears inapplicable, and that Defendant Christopher Gildea's admissions are not admissible against Defendant Arlington under Rule 801(d)(2)(A).

Further, the Court agrees that the Plaintiff has failed to make any showing that Defendant Christopher Gildea's statements are coconspirator statements admissible under Rule 801(d)(2)(E) or that they should be admitted under Rule 807. The Court notes, however, that both Defendant Mercer and Defendant Motter stated in their depositions that they were aware of a proposal for Comerica to finance the GT Defendants up to $3.7 million to purchase the assets of the Debtor. (Mercer Dep. 42, ECF No. 224-3; Motter Dep. 48, ECF No. 224-7.) Defendant Mercer stated he heard about the proposal from Defendant Christopher Gildea. Accordingly, the Court will consider the existence of a proposal for Comerica to finance the GT Defendants' attempt to purchase the assets of the Debtor up to $3.7 million. But the Court will grant the Motion to Strike as to Defendant Arlington with respect to paragraph 22 of Werling's Affidavit. If the Plaintiff can lay a proper foundation for this evidence at trial, the Court will reconsider the Motion to Strike.

d.      *Defendant Motter's Time Line and BKD Time Report*

The Defendants argue that Defendant Motter's Time Line [ECF No. 224-11] and BKD Time Report [ECF No. 224-13] are unauthenticated, and Defendant Arlington argues they contain hearsay statements as to Defendant Arlington. The GT Defendants also argue that the BKD Time Report is hearsay as to "Defendants," but make no hearsay argument with respect to the Time Line. The Plaintiff responds that Defendant Motter authenticated the Time Line at his deposition (Motter Dep. 57, ECF No. 240-3), and offers the subpoena and production email for the BKD Time Report (*see* ECF Nos. 240-4 & 240-5) in order to authenticate it. The Plaintiff makes no response to the Defendants' hearsay arguments. Because the Time Line appears to be an out of court statement offered for the truth of the matter asserted—that Defendant Motter was informed on December 31, 2002, that he would be leaving BKD, and because the Plaintiff has not shown why an exception would apply, the Court will grant the Motion to Strike with respect to Defendant Arlington. Further, the BKD Time Report appears to be an out of court statement

offered for the truth of the matter asserted—that Defendant Motter met with Bill Badie on February 11, 2003. Although the Plaintiff has not shown why an exception would apply, viewing all reasonable inferences in favor of the non-moving party, because it appears that the BKD Time Report is a business record admissible under Rule 803(6), the Court will deny the Motions to Strike with respect to the BKD Time Report.[4]

e.      *Debtor's Sales Transactions Spreadsheet*

The Defendants argue that the Sales Transactions Spreadsheet [ECF No. 224-17] submitted by the Plaintiff is unauthenticated, is hearsay, and cannot be used by the Plaintiff to support the statement that the Debtor's accounts receivable had rebounded to over $628,000 by April 10, 2003. The Plaintiff offers no response to the Defendants' arguments. Accordingly, the Motions to Strike will be granted with respect to the Sales Transactions Spreadsheet. If the Plaintiff can lay a proper foundation for this evidence at trial, the Court will reconsider the Motions to Strike. The Court notes that none of the Defendants have objected to the Debtor's Ledger, which states that the Debtor's trade accounts receivable dipped below $300,000 on March 10, 2003, and amounted to over $628,000 by April 10. (Ledger, ECF No. 224-14 at 6–7.) The Court will therefore consider those facts.

f.      *Steven Gildea Personal Financial Statement*

The Defendants argue the financial statement submitted by Steven Gildea and dated January 15, 2003, is unauthenticated, and Defendant Arlington argues it is also hearsay as to Defendant Arlington. The Plaintiff does not respond to either the authentication or hearsay

---

[4]The Plaintiff also argues that Defendant Mercer testified at his deposition that the February 2003 meeting between the GT Defendants and Defendant Arlington "occurred before Sean McBride was terminated on February 13, 2003." (McCarthy Decl. ¶ 3, ECF No. 240.) However, nothing in the portions of Defendant Mercer's deposition submitted by the Plaintiff states the date of McBride's termination.

arguments against admissibility. Accordingly, the Motions to Strike will be granted. If the Plaintiff can lay a proper foundation for the financial statement at trial, the Court will reconsider the Motions to Strike. However, the Court notes that the Defendants submitted the second page of the financial statement as part of their summary judgment motions, indicating that Steven Gildea faxed to Comerica his personal financial statement on January 16, 2003, and indicating that it was considered as part of Comerica's February 13 recommendation to extend financing to the GT Defendants. Those facts are before the Court without limitation. *United States v. Capital Sav. Ass'n*, 576 F. Supp. 790, 797 (N.D. Ind. 1983) ("Where a party seeks to limit the purpose for which evidence is admitted at trial, it is incumbent upon the party to make an explicit request for such a limitation."); Fed. R. Evid. 105.

g.      *Zarb's $4.895 Million Valuation of the Debtor's Assets, and Zarb Deposition Exhibit G*

Defendant Arlington argues that Zarb's deposition statement that the assets of the Debtor were worth $4.895 million should be stricken because Zarb did not have personal knowledge of that fact and because Zarb did not have the qualifications to make such a valuation. Defendant Arlington also argues that the statement on page 13 of Exhibit G to Zarb's Deposition is unauthenticated, and is hearsay. The Plaintiff does not respond to any of these arguments. The Court finds that Zarb testified the value of the Debtor's assets was $4.895 million. At his deposition, the Defendants did not attempt to undercut his personal knowledge of that fact or his qualifications to give an opinion about the value of the property. Although Zarb's testimony appears to reference Exhibit G, the words he used do not suggest he lacked a basis upon which to testify to this fact. Accordingly, the Court will deny the Motions to Strike as to Zarb's statement that the assets of the Debtor were worth $4.895 million. Furthermore, the Court notes that the Defendants submitted Exhibit G to Zarb's Deposition as part of their summary judgment motions. Accordingly, Exhibit G being offered without limitation by the Defendants, *Capital*

23

*Sav. Ass'n*, 576 F. Supp. at 797, the Court will deny the Motions to Strike with respect to Exhibit

G and consider it for its internal assertion that the assets of the Debtor were worth $4.895

million.

**3.**     *Analysis*

Section 363(n) of the Bankruptcy Code states:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

11 U.S.C. § 363(n). The Plaintiff alleges that the Defendants entered into an agreement

controlling the sale price of the Debtor's assets and seeks compensatory damages, costs, fees,

and punitive damages for willful disregard of § 363(n). For the Plaintiff to prevail, "(1) there

must be an agreement; (2) between potential bidders; (3) that controlled the price at bidding."

*Birdsell v. Fort McDowell Sand & Gravel (In Re Sanner)*, 218 B.R. 941, 944–45 (Bankr. D.

Ariz. 1998). An agreement controls the sale price where an intended objective of the agreement

is to influence the sale price, and where the sale price is actually controlled by the agreement. *In

re N.Y. Trap Rock Corp.*, 42 F.3d 747, 752 (2d Cir. 1994). Where potential bidders enter an

agreement, and the agreement has as an unintended consequence an effect on the sale price, the

agreement does not control the sale price within the meaning of § 363(n). *Id.* ("The influence on

the sale price must be an intended objective of the agreement, and not merely an unintended

consequence."). The *Trap Rock* court further outlined the concept of control, distinguishing

control of a sale price from effect on a sale price, and stating: "To control a price is to exercise

restraining or directing influence over it; to regulate or curb, dominate, or rule it. In such context

the term control implies more than acts causing an incidental or unintended impact on the price; it implies an intention or objective to influence the price." *Id.* (quotation marks and citation omitted). Finally, where the trustee seeks to recover damages instead of seeking to avoid a sale, in order to prove damages a plaintiff must show that the value of the assets sold at auction actually exceeded the price paid for the assets. *See Landscape Props., Inc. v. Vogel*, 46 F.3d 1416, 1423 (8th Cir. 1995) (upholding a district court jury instruction which listed the following as an element of the § 363(n) claim: "that the value of the property at the time of the approval of the sale by the Court . . . exceed[ed] the purchase price.").

The Court must decide whether there is a triable issue of material fact as to 1) the existence of an agreement between the Defendants to control the price of the Debtor's assets at auction; 2) whether any agreement by the Defendants could have actually controlled the price at auction in light of Comerica's statutory rights as an undersecured creditor; and 3) whether the Plaintiff can show that the actual value of the Debtor's assets exceeded the price paid at auction.[5]

The Court notes that the evidence submitted by the Defendants alone is significant, and raises a new inference not present before the Court when it issued its August 24, 2007, Opinion. The Defendants have submitted Exhibits G and V to Ernest Zarb's Deposition. Exhibit G is a Comerica Bank risk rating and loan recommendation dated February 13, 2003. It indicates that a Comerica loan department representative recommended financing the Gildeas' attempt to purchase the assets of the Debtor with several different loan transactions totaling approximately $3.7 million. It includes a valuation of the total assets of the Debtor at $4.895 million. It also

---

[5]The Defendants have not argued that any Defendant was not a potential bidder at the auction within the meaning of § 363(n). Nor have the Defendants argued that there is any issue as to the intention to control the price at auction. Rather, they have argued that there was no agreement to control the price at auction at all; and in the alternative, they have argued that even if there were such an agreement, it could not have actually controlled the price at auction. The Defendants have not argued that an agreement could have existed without the intention of controlling the price at auction. For obvious reasons, the Plaintiff has also not raised such a possibility. Accordingly, the Court will analyze the issues as raised by the Defendants in their motions.

indicates that the liquidation value of the Debtor's assets is $3.1–3.2 million. Exhibit V is an internal Comerica document with status updates regarding the loan to the Debtor. The entries begin September 14, 2001, and continue through August 20, 2003. The December 5, 2002, entry indicates Comerica's receipt of the Gildeas' first offer. The December 20 entry indicates Comerica's receipt of the Gildea's second offer, described as "still too low." (Zarb Dep. I Ex. V, ECF No. 215-9 at 48.) The January 9, 2003, entry indicates the Gildeas had "counter offered their first bid" and that as "the Gildeas are the only viable bidder," Comerica would continue to work with the Gildeas. (*Id.*) The February 13 entry indicates that Comerica had approved "[t]he Gildea's offer," which appears to be the offer recommended in Exhibit G. The February 14 entry indicates Comerica's receipt of an offer of $2.55 million for the assets of the Debtor from Defendant Arlington. The February 28 entry indicates that "the Gildeas' have revoked their original bid and have under bid." (*Id.* at 47.) It also states that Defendant Arlington had upped its bid to $2.7 million. The March 4 entry shows that Comerica approved three possible options for disposing of the assets of the Debtor, including "[t]he new Gildeas' offer," Defendant Arlington's $2.7 million offer, and, as a last resort, a collateral liquidation plan. (*Id.*) Finally, the April 2 entry indicates that Defendant Arlington had accepted Comerica's "cash offer" of $2.725 million for the assets of the Debtor. (*Id.* at 46–47.)

When the Court issued its August 24, 2007, Opinion, the evidence before the Court showed only that the GT Defendants and Defendant Arlington began meeting together sometime in February 2003, that Comerica faxed the GT Defendants a financing proposal on March 3, 2003, and that the GT Defendants chose to reject the terms communicated by Comerica. All indications were that the terms communicated on March 3 came as the result of an offer from Comerica to the GT Defendants. The Defendants continue to hold to this assertion, arguing in their briefs that "the alleged financing proposal was in no way related to any offers the Gildeas had made to Comerica." (GT Defs.' Br. in Supp. 10, ECF No. 209; Def. Arlington's Br. in Supp.

10, ECF No. 213.) The evidence submitted by the Defendants, however, suggests another possibility. The log entries in Exhibit V show that time and again Comerica representatives were considering offers described as the "Gildea's offer." The February 28 entry indicates that the Gildeas revoked their offer and suggests they submitted a lower offer. As late as March 4, Comerica describes the offer on the table as "[t]he new Gildeas' offer." The evidence submitted by the Defendants shows that negotiations between Comerica and the GT Defendants for financing continued into March 2003. The Defendants have averred in their Statement of Material Facts that "[t]he First Offer, Second Offer, Third Offer, and the proposal attached to the Sale Motion were the only offers that Christopher Gildea, Anita Gildea, and/or Matt Mercer made to purchase GT Automation Group's assets." (GT Statement of Material Facts ¶ 23, ECF No. 210; Arlington Capital Statement of Material Facts ¶ 23, ECF No. 214.) But the Defendants' evidence suggests that a reasonable jury could find the opposite to be true—that the GT Defendants communicated one or more other offers after the Third Offer,[6] and offers that were considerably more substantial than the Sale Motion proposal. As discussed below, if the offer rejected by the GT Defendants was actually their own offer, it would strengthen the inference of collusion between the Defendants when the GT Defendants walked away from the possibility of financing by Comerica.

a.     *Agreement Between the Defendants to Control the Price at Auction*

The Court finds, first, that there is substantial evidence upon which a rational factfinder could conclude that an agreement existed between the Defendants to control the price at auction.

---

[6]The Defendants admit that the Third Offer expired on January 15, 2003. (ECF No. 215-8 at 18, 20.) Yet on January 16, Defendants Christopher Gildea and Matt Mercer, in addition to Steve Gildea, Anita Gildea, and Joseph Siela, signed the Loan Commitment from the Community Development Corporation, requiring them to obtain additional financing within a six month period. (CDC Loan Commitment, ECF No. 215-8 at 28.) This financing may have been pursuant to the proposal attached to the Sale Motion, or it may have related to additional financing possibilities with Comerica.

Most of the facts before the Court have not changed since August 2007. As the Court previously stated:

> The evidence submitted shows that the Gildea Group strongly wanted to purchase the Debtor's assets. Throughout 2002 and into the first part of 2003, the Gildea Group negotiated with Comerica to buy the Debtor's assets, with financing from Comerica. Comerica proposed a sale of the assets for $3.7 million. When Arlington became interested in purchasing the Debtor's assets, the Gildea Group completely stopped negotiating with Comerica and began negotiating with Arlington. Those negotiations involved an ownership role for the Gildea Group. Ultimately, Arlington, by itself, submitted the highest bid at auction, and the Gildea Group did not submit a bid. Immediately following the auction, the Gildea Group purchased the assets from Arlington. A reasonable jury could infer from these facts that the Gildea Group and Arlington reached an agreement to work together rather than bid against each other.

*Boyer v. Gildea*, 374 B.R. at 660. The Court notes that with only two exceptions, its analysis is the same today as it was in 2007. The first exception is that in 2007 the Court was assuming that "Comerica proposed" to finance the GT Defendants' attempt to purchase the Debtor's assets for $3.7 million, whereas the evidence submitted by the Defendants suggests that the financing proposal may have originated with the GT Defendants themselves. Secondly, in 2007 the Court was assuming that the first meeting between the GT Defendants and Defendant Arlington occurred in "late February 2003," *id.* at 559, whereas the evidence submitted from discovery suggests the first meeting actually occurred even earlier—on February 11, 2003. Both of these new facts only strengthen the inference that the reason the GT Defendants in March declined the financing they had been so fervently seeking since the previous summer was that they had an agreement with Defendant Arlington which had been developing since February 11. The Defendants still insist that "negotiations between the Gildeas and Comerica broke down on January 6, 2003—well before any conversations with Arlington Capital." (GT Defs.' Br. in Supp. 17; Def. Arlington's Br. in Supp. 17.) But evidence of a February 11 meeting between the GT Defendants and Defendant Arlington, combined with a Comerica entry on March 4

discussing "[t]he new Gildeas' offer," casts doubt on the Defendants' position.

As before, the GT Defendants argue they had legitimate reasons for declining Comerica's financing. The question of whether their purported reasons were their real reasons is a question for a jury. But as the Court previously stated:

> the fact that the Gildea Group declined financing from Comerica shortly after meeting with Arlington, the fact that the parties could both benefit by working together, the fact that they never disclosed the fact that they had been negotiating, the fact that the Gildea Group never reopened discussions with Comerica, and the fact that Arlington sold its interest in the assets to the Gildea Group shortly after the auction, make the inference that the Defendants agreed to work together with the intent of obtaining a lower bid price more likely.

*Id.* at 661. All of these factors remain before the Court, and all of them strengthen the inference from which a jury could find that the Defendants entered into an agreement with the intent to control the price at auction. The Court notes that statements by Defendant Mercer also serve to strengthen the inference that the Defendants agreed to work together to lower the auction price. He states that from the beginning of the GT Defendants' association with Defendant Arlington he understood the parties to be forming a partnership to bid cooperatively at auction instead of viewing Defendant Arlington as a competing bidder for the Debtor's assets. (Mercer Dep. 30–31.) Thus, making all reasonable inferences in favor of the Plaintiff, from February 11 on the Defendants were working together to bid cooperatively at the auction, and to keep their collusion a secret from Comerica.

The Defendants argue that they have produced evidence that the refusal of the terms in the March 3 fax represented sound business judgment, and thus under anti-trust case precedent, the burden is on the Plaintiff to show that "the inference of conspiracy is reasonable in light of the competing inference[ ] of independent action." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 599 (7th Cir. 1995) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). As the Supreme Court has stated: "Conduct that is as consistent with permissible

competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* (quoting *Matsushita*, 475 U.S. at 588) (brackets omitted). The Seventh Circuit set forth its formulation for sufficiency of the evidence in an antitrust conspiracy case as follows:

> (1) is the plaintiff's evidence of conspiracy ambiguous, *i.e.*, is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.

*Market Force Inc. v. Wauwotosa Realty Co.*, 906 F.2d 1167, 1171 (7th Cir. 1990) (quoting *Gibson v. Greater Park City Co.*, 818 F.2d 722, 724 (10th Cir. 1987)); *see Serfecz*, 67 F.3d at 599.

The Court did not previously decide and does not now hold that the standard for evaluating evidence of a conspiracy in the antitrust context should always be applied to allegations of fraud in a bankruptcy case. On this issue, the Court previously held only that the Plaintiff's evidence of conspiracy was sufficient to overcome summary judgment even with the application of a heightened conspiracy standard. As the Court held: "the full context of the parties' dealings makes the inference of collusion more reasonable" than the inference of independent action, and therefore whether or not the heightened standard for substantiating a conspiracy in the antitrust context applied, the evidence produced by the Plaintiff satisfied that standard. *Boyer*, 374 B.R. at 662. For the reasons discussed below, the Court finds that the Plaintiff's evidence still establishes an inference of collusion between the GT Defendants and Defendant Arlington which is more reasonable than the inference that the GT Defendants and Defendant Arlington were merely pursuing independent interests. Because the Court finds that the evidence of conspiracy is not ambiguous, *i.e.*, it is not as consistent with the Defendants' permissible independent interests as with an illegal conspiracy, the Court does not require the Plaintiff to produce evidence tending to exclude the possibility that the Defendants were pursuing independent interests instead of colluding.

Specifically, the Defendants offer the following arguments that they engaged in independent, legitimate business conduct. The Defendants argue that the February and March entries in Exhibit V merely represent Comerica's continuing changes to the Gildeas' offer of January 6, 2003, and do not suggest a new offer or any continuing involvement by the GT Defendants. As discussed above, the Court finds this reasoning unpersuasive in light of the number of references in Exhibit V suggesting that the GT Defendants were still actively bargaining with Comerica. The Defendants also argue that the March 3 fax does not contain terms normally associated with an offer. But if it represented nothing more than Comerica's agreement to an offer previously tendered by the GT Defendants, then it would have been reasonable for Comerica to communicate its acceptance in light of the GT Defendants' previous offer, and not to include all the terms normally associated with an offer. The Defendants argue, additionally, that the terms included in the March 3 fax would have required them to pay much more than the assets were actually worth. But the Court finds that the $4.895 million valuation of the Debtor's assets—evidence submitted by the Defendants—undercuts the Defendants' argument. The Defendants continue to argue that they could not have accepted the terms of the March 3 fax because it included an ongoing business relationship with Comerica, a relationship the Defendants argue was irrevocably broken by March 2003 due to various factors including Comerica's restriction of the Debtor's use of its cash collateral account. But Court finds that, according to Exhibit V, the relationship between the GT Defendants and Comerica continued at least until March 4 when the proposal under discussion was described as "[t]he new Gildeas' offer." (Zarb Dep. I Ex. V, ECF No. 215-9 at 47.) Finally, the Defendants argue that it was impossible for the GT Defendants to accept the March 3 fax offer because of its terms which required a cash investment of $650,000, and because it did not address their need for working capital. Both Defendants Motter and Christopher Gildea assert that on March 3 it was impossible for the GT Defendants to raise $650,000 and that without working capital (*i.e.* use of the cash

collateral account) they could not operate a business. The Court finds these assertions to be questions of fact for a jury to decide, particularly in light of the following: The Debtor's Ledger, to which the Defendants have offered no objection, shows that although the accounts receivable on March 3 amounted to only $328,000, by April 3 the accounts receivable rebounded to over $663,000. Furthermore, the Plaintiff has introduced evidence that the GT Defendants had the possibility of partial financing from Huntington Bank, financing from Greenfield Commercial Credit at least as of November 2002, and a loan of $250,000 from the Fort Wayne Community Development Corporation, contingent on the GT Defendants obtaining other financing within six months of January 16, 2003. Finally, as previously highlighted, the Court accepts as a reasonable inference in favor of the Plaintiff the possibility that the terms of the March 3 fax represented an offer from the GT Defendants to Comerica. In light of the Court's reasonable inference, it is reasonable to suppose that a party making an offer believes it is possible to accept it. Given all the evidence before the Court, there is a material question of fact concerning whether the GT Defendants declined the terms contained in the March 3 fax because of an agreement with Defendant Arlington to control the price of the Debtor's assets at auction.

The Defendants cite the Supreme Court's opinion in *First National Bank of Arizona v. Cities Service Co.* for the proposition that declining a business deal only raises the inference of collusion if the business deal was a good one. 391 U.S. 253, 279 (1968) ("[I]t is only the attractiveness of the petitioner's offer that makes failure to take it up suggestive of improper motives."). The Court has already analyzed the reasons that the terms of the March 3 fax may or may not have represented an attractive business opportunity for the GT Defendants. The Court notes, additionally, that the inference of collusion arises from more than just the GT Defendants turning down one particular business proposal on or about March 3, 2003. The evidence before the Court shows that by March 2003, some or all of the GT Defendants had been actively pursuing financing to purchase the assets of the Debtor for at least eight months. The GT

32

Defendants admit to submitting the Amended Plan Offer in July 2002, three distinct offers in December 2002 and January 2003, and another proposal as an attachment to the Sale Motion in February 2003. Yet, they not only spurned a financing proposal in early March 2003 which would have allowed them to realize the goal they had been pursuing for so long, they also ceased any further negotiations with Comerica for financing. Even if the March 3 fax represented an offer from Comerica to the GT Defendants, and even if that offer were unpalatable from a business perspective, the facts before the Court still show that after declining the March 3 fax terms the GT Defendants made no further efforts to obtain financing for the following month until the auction. The Court finds that the GT Defendants' larger course of conduct—in addition to the decision not to accept the terms of the March 3 fax—reasonably suggests that the GT Defendants ceased their search for financing because they had an agreement with Defendant Arlington to obtain the assets of the Debtors in a mutually beneficial manner.

As the *Trap Rock* court noted, agreements to control the price of a debtor's assets at auction are not likely to be reduced to writing. *Trap Rock*, 42 F.3d at 753. The Plaintiff's evidence is therefore—necessarily—circumstantial evidence showing why an inference of collusion is reasonable in light of the relationship between the parties. Because the Court finds that the inference of collusion is more reasonable than the inference that the Defendants acted independently, a reasonable jury could conclude from all the evidence that there was an agreement between the Defendants intended to control the price of the Debtor's assets at auction.

b.      *Whether an Agreement by the Defendants Could Have Actually Controlled the Price at Auction*

The Court finds, secondly, that if an agreement existed between the GT Defendants and Defendant Arlington, it could have controlled the price at auction within the meaning of § 363(n). As the *Trap Rock* court stated: "To control a price is to exercise restraining or directing

influence over it; to regulate or curb, dominate, or rule it. In such context the term control implies more than acts causing an incidental or unintended impact on the price; it implies an intention or objective to influence the price." *Trap Rock*, 42 F.3d at 752 (quotation marks and citation omitted). The Court has previously held that the agreement between Comerica and Defendant Arlington to accept Defendant Arlington's $2.725 million offer as a stalking horse bid at the auction was not an agreement to control the price at auction within the meaning of § 363(n) because it was designed to set the floor for bidding, not to bring down the final sale price. The Court agrees with the Defendants that an agreement proscribed by § 363(n) must do more than have the intention of influencing the sales price—it must actually influence the price.[7] The Court finds that, under the facts of this case, an agreement between the GT Defendants and Defendant Arlington could have actually controlled the auction price within the meaning of § 363(n), in spite of Comerica's status as an undersecured creditor.

The Defendants argue that Comerica's right to credit bid the total amount of its claim against the assets of the Debtor—which all parties acknowledge was well in excess of the amount paid for the assets of the Debtor at auction[8]—negates the elements of a claim under § 363(n) because Comerica alone controlled the price at the auction. Specifically, the Defendants argue that when Comerica credit bid an amount less than the amount of Defendant Arlington's bid, Comerica controlled the price at auction by not credit bidding the full amount of its claim. The Plaintiff responds that the plain language of the statute allows a § 363(n) claim where there is a secured creditor, whether or not that secured creditor is in an undersecured position. The Defendants reply that while the Plaintiff certainly has standing to bring a § 363(n) claim, he cannot establish the elements of such a claim because Comerica as the undersecured

---

[7]The Defendants are incorrect in suggesting that the Court's August 2007 analysis equated control under § 363(n) with mere intent to control apart from actual control.

[8]Comerica filed a proof of claims in the bankruptcy proceedings for over $7.8 million.

creditor—and Comerica alone—controlled the price at auction.

In support, the Defendants cite to cases and a statute with varying degrees of connection to the statutory right to credit bid. They cite a United States Bankruptcy Court decision stating that an undersecured creditor "could simply bid in the amount of its debt at the sale and thereby control the amount of the sales price." *In re Dewsnup*, 87 B.R. 676, 683 (Bankr. D. Utah 1988). They point the Court to the exception to the protections offered to nonrecourse creditors under § 1111(b)(1)(A)(ii) of the Bankruptcy Code, providing no protection to a nonrecourse creditor if such creditor already has the right to credit bid under § 363. Finally, the Defendants argue that the case of *In re Hat*, 310 B.R. 752 (Bankr. E.D. Cal. 2004), shows that a court-designed equitable remedy similar to credit bidding ensures competitive bidding.

The Court agrees with the Defendants that the ability to credit bid could allow an undersecured creditor to control the price at auction. *See Dewsnup*, 87 B.R. at 683 (the undersecured creditor "*could* . . . control the amount of the sales price") (emphasis added). However, where the potential bidders at a § 363 sale collude to control the price and their collusion is not uncovered, it is their agreement, and not the undersecured creditor's bid, that actually controls the price at auction within the meaning of § 363(n). "To control a price is to exercise restraining or directing influence over it; to regulate or curb, dominate, or rule it." *Trap Rock*, 42 F.3d at 752 (quotation marks omitted). If the undersecured creditor has full information about the value of the assets as determined by the interest the assets generate at auction and the number of parties interested in bidding on them, then the undersecured creditor's credit bid could dominate or rule the price at auction. But if the undersecured creditor's belief about the value of the collateral is clouded by deception, then it is the agreement of the colluding parties and not the misinformed credit bid that dominates or rules the price at auction. The Defendants' citation to *In re Hat* illustrates the point. The *Hat* court fashioned a remedy much like credit bidding because it was informed about the collusion between the potential bidders at the auction. If the

collusion had not come to light, then the collusive agreement between the potential bidders would have controlled the price at auction. Further, the *Hat* court's remedy also included a requirement that in the subsequent auction "all investors, co-owners and sources of financing in connection with any bid" be identified in writing. *Hat*, 310 B.R. at 761. Without such full disclosure, there could be no competitive bidding. The Defendants cite to § 1111(b)(1)(A)(ii) as part of their argument that "an undersecured creditor will act in its own economic best interest." (GT Defs.' Br. in Supp. 5; Def. Arlington's Br. in Supp. 5.) But collusion between potential bidders as outlined in § 363(n) can thwart an undersecured creditor's attempt to act in its best economic interest. Section 363(n) exists precisely because collusive agreements between potential bidders can actually control the price at auction, and an undersecured creditor unable to credit bid in its economic best interest is damaged by such deception.[9]

Thus, the Defendants' arguments about the impossibility of anyone except Comerica controlling the price at auction ring hollow. The Defendants argue that no agreement between the Defendants could have actually controlled the price at auction "as the parties had no ability to control the bidder with the right of first refusal—which solely was Comerica." (GT Defs.' Br. in Supp. 19; *see* Def. Arlington's Br. in Supp. 19.) But making all reasonable inferences in favor of the Plaintiff, the Defendants did have the ability to control Comerica—by a less than full disclosure about the identities of the parties to Defendant Arlington's bid, which convinced Comerica to enter a low credit bid in order to get some recovery. It is undisputed that the bankruptcy court's order required all bids to fully disclose the identities of the bidding parties, yet the schedule that would have identified the bidders was not included with Defendant Arlington's April 2, 2003, bid. As Comerica Vice President Zarb stated in his deposition, part of

---

[9]The Court notes that many bankruptcies involve undersecured creditors with the ability to credit bid. If the Court accepted the Defendants' policy argument that claims under § 363(n) are impossible where an undersecured creditor can credit bid, the exception could effectively swallow the rule.

the reason Comerica accepted a low bid from Defendant Arlington instead of entering a higher credit bid was that "Cash is king. Cash has more value than other things." (Zarb Dep. 149.) The Plaintiff argues this point, urging that had Comerica known the GT Defendants were involved with Defendant Arlington's bid, it would have entered a credit bid more in line with the financing proposal for the GT Defendants already approved by Comerica. The Plaintiff's argument on this point is strengthened by the transcript from the March 5 hearing before the bankruptcy court which shows that both Comerica and the Committee of Unsecured Creditors were ready to oppose any effort by the GT Defendants to purchase the assets of the Debtor cheaply. The Defendants, in response to the Plaintiff's argument, appear to make the Plaintiff's point, stating: "Comerica was not obligated to consent to a sale for an amount less than it believed would be in its best interest." (Def. Arlington's Reply 9, ECF No. 227; GT Defs.' Reply 9, ECF No. 236.) The Defendants are quite correct that Comerica's action was based on what it believed was in its best interest. But § 363(n) exists to protect all creditors from being deceived by a collusive agreement between potential bidders, including those in a powerful bargaining position based on their ability to credit bid.

Making all reasonable inferences in favor of the Plaintiff, the Defendants formed a collusive agreement to control the price at auction by not bidding against each other, and by not revealing that the GT Defendants were part of Defendant Arlington's bid. The Court finds that such an agreement—if it existed—could have actually controlled the price at the auction by influencing Comerica's credit bid.

c.     *Evidence that the Actual Value of the Debtor's Assets Exceeded the Auction Price*

The Court finds, thirdly, that the Plaintiff has enough admissible evidence that the value of the assets sold at auction exceeds the auction price to overcome summary judgment. Because the Plaintiff is seeking damages under § 363(n) instead of an avoidance action, the Plaintiff must

show that there are actual damages. He can do this by showing that the value of the Debtor's assets at the time of the auction exceeded the auction price. *See Landscape Props.*, 46 F.3d at 1423 (upholding a district court jury instruction which listed the following as an element of the § 363(n) claim: "that the value of the property at the time of the approval of the sale by the Court . . . exceed[ed] the purchase price"); *In re Edwards*, 228 B.R. 552, 566 (Bankr. E.D. Pa. 1998) ("Absent a showing that the agreement actually did deprive the estate of fair value for the assets, the sale should be confirmed."). The Defendants argue that the Debtor's assets were necessarily sold for their fair market value because Comerica consented to the sale. The Defendants also argue that the Plaintiff has no admissible evidence from which he can show that the actual value of the assets on the date of the auction exceeded the auction price. For the reasons below, the Court disagrees on both points.

As an initial matter, consistent with the discussion above, Comerica's approval of Defendant Arlington's bid was based upon what Comerica knew about the value of the assets. The Defendants argue from the case of *In re Dever*, 164 B.R. 132 (Bankr. C.D. Cal. 1994), that an undersecured creditor at a § 363 sale must necessarily receive either the fair market value of the collateral or the collateral itself. *Id.* at 135 ("If an undersecured creditor forecloses, one of two things happens: either the creditor is paid in cash the fair market value of the property . . . or the creditor buys the property itself by credit-bid."). But the Defendants' statement of their argument is again instructive: "The statutory protections built into the Bankruptcy Code assure that undersecured creditors receive either what they believe is the value of their collateral or the collateral itself." (GT Defs.' Br. in Supp. 8; Def. Arlington's Br. in Supp. 8.) The Defendants acknowledge that undersecured creditors' recovery is based on "what they believe is the value of their collateral." When the bidding process is not manipulated, an undersecured creditor's informed belief about the value of its collateral will likely ensure that the undersecured creditor

either consents to an auction price[10] or credit bids to purchase the assets. But when the undersecured creditor is deceived about the value of the collateral by potential bidders colluding to control the price at auction, its low credit bid is not dispositive of fair market value.

As to the evidence necessary to show that the value of the Debtor's assets on the date of the auction exceeded the auction price, the Court has already addressed the admissibility of many documents, and finds that the Plaintiff has produced enough evidence to overcome summary judgment on this issue. Specifically, again making all reasonable inferences in favor of the Plaintiff, the Court notes the following evidence, all of which suggests the Plaintiff will be able to prove damages at trial: Exhibit G to Zarb's deposition, admitted by the Defendants, includes a valuation of the Debtor's assets at $4.895 million as of February 12, 2003 (Zarb Dep. I Ex. G, ECF No. 215-9 at 35); Badie admitted that he calculated a net gain of over $1 million on the purchase of the Debtor's assets, to be realized by the GT Defendants and Defendant Arlington (Badie Dep. 67–68); Exhibit V to Zarb's deposition suggests that the financing proposal approved by Comerica represented the GT Defendants' offer to purchase the Debtor's assets for approximately $3.7 million; even the liquidation value of the assets as of the risk rating and loan recommendation of February 13, 2003, was at least $3.1 million—still $375,000 more than the price Defendant Arlington paid at auction (Zarb Dep. I Ex. G, ECF No. 215-9 at 29). Furthermore, Defendant Christopher Gildea's August 15, 2003, letter to First Federal Bank of Huntington is admissible against Defendant Christopher Gildea and indicates that the value of the assets purchased at auction was $5 million. (Letter, ECF No. 80-2.) Finally, it is undisputed that the GT Defendants purchased GTA Acquisition from Defendant Arlington on July 25, 2003, for $625,000, and that they paid Defendant Arlington $300,000 on the date of the Buyout

---

[10]The Court need not decide whether an undersecured creditor's consent to an auction price is always dispositive of the fair market value of the assets. The Court holds only that in the case of deception and collusion between potential bidders, an undersecured creditor's consent to an auction price is not dispositive of the fair market value of the assets.

Agreement. The Court understands the Defendants' argument that Badie's calculation was merely a profit projection based on the investment of time and money, and based on incurring the risk of the investment. Nevertheless, the Court finds that his projection of a net profit, a profit Defendant Arlington realized shortly after the transaction, is not irrelevant to the question of the value of the assets on the date of the auction. The Court also understands the Defendants' argument that the values in Exhibit G were calculated two months before the auction. But the Court finds that these valuations are also not irrelevant to the value of the assets on the date of the auction. As to whether and how much money the Debtor was losing, the Court finds that a jury can answer that question in light of the evidence adduced by the Plaintiff.[11]

Further, the Court need not decide whether a liquidation value of the assets or a going concern value was appropriate as of the auction date. The Seventh Circuit has stated—not in the context of § 363(n)—that liquidation value is the appropriate valuation method where an entity is on its deathbed. *In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1990) (stating that "going-concern value is not the proper standard if the business is 'on its deathbed,'" but finding that the business was not on its deathbed) (quoting *In re Utility Stationery Stores, Inc.*, 12 B.R. 170, 176 (Bankr. N.D. Ill. 1981)). The Court notes, however, that the evidence on this point is inconclusive. Defendant Arlington's agreement with Comerica to purchase the assets mandated that the Debtor "continue to operate in the ordinary course of business" until the closing date.

---

[11]The Defendants are correct that in the absence of any evidence of damages summary judgment would be appropriate. *Ray v. State Farm Mut. Auto. Ins. Co.*, No. 1:05-cv-1782-DFH-TAB, 2008 WL 474220, at *2–3 (S.D. Ind. Feb. 19, 2008) (granting summary judgment because the plaintiff's evidence did "not meet plaintiff's burden of coming forward with evidence that would allow any damage award based on more than speculation or conjecture"). Further, where the scope and existence of damages is "difficult to ascertain" due to the complexity of a case, expert testimony may be required to show damages. *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744 (S.D.N.Y. 1985). But the Defendants have not cited a case holding that expert testimony is required to show the existence of damages under § 363(n), and in light of the significant evidence regarding the value of the assets of the Debtor, the Court finds in this case that expert testimony is not required to show that damages exist at the summary judgment stage, but may be helpful when this case proceeds to trial.

(Mem. of Agreement ¶ 2.6, ECF No. 215-12.) Moreover, when Defendant Arlington purchased the assets of the Debtor, it did so with the understanding that the Debtor would "use its best efforts to operate the Business only in the ordinary course and in a manner consistent with its past operations, keep and preserve its Business and Assets in present condition and repair and maintain insurance thereon in accordance with present practice, and . . . use its best efforts to preserve its Business and organization intact" until the date of closing. (Asset Purchase Agreement ¶ 11.5, ECF No. 215-4.) The evidence suggests Defendant Arlington purchased the Debtor's assets as a going concern, and that such a valuation may be appropriate if the Plaintiff can produce admissible evidence on that point at trial. In any case, that is for the Plaintiff to show at trial.

Because it appears that the Plaintiff has put forward evidence sufficient to support a jury finding of damages, the Court finds the Plaintiff has introduced enough admissible evidence to overcome summary judgment on the question of damages.

**C.      The Plaintiff's Request for Attorney's Fees**

The Plaintiff again urges the Court to award him his fees incurred in opposing these motions under 28 U.S.C. § 1927, which allows a court to award attorney's fees where an attorney "multiplies the proceedings in any case unreasonably and vexatiously." The Seventh Circuit has stated that a court may award attorney's fees under § 1927 where an attorney has acted in an "objectively unreasonable manner." *Jolly Grp., Ltd. v. Medline Indus., Inc.*, 435 F.3d 717, 720 (7th Cir. 2006) (quoting *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 119 (7th Cir. 1994)). "The purpose of § 1927 is to deter frivolous litigation and abusive practices by attorneys and to ensure that those who create unnecessary costs also bear them." *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005) (quotation marks omitted). The Plaintiff argues that in light of the February 26, 2009, telephonic conference where this Court ordered the

Defendants not to file summary judgment motions on issues already decided by the Court, the present motions before the Court deserve sanctions.

The Court disagrees. The present Motions for Summary Judgment and Motions to Strike involve the tail end of an extended discovery and litigation process, and contain evidentiary and legal arguments not previously raised. Under the circumstances before the Court, § 1927 sanctions are inappropriate, and the Plaintiff's requests for attorney's fees will be denied.

**D.      The Plaintiff's Motion for an Order Summarily Striking the Defendants' Motions**

Because the Court has considered and ruled on all dispositive motions, the Plaintiff's Motion for an Order Striking or Summarily Denying Defendants' Motions Addressed to Count III [ECF No. 216] will be denied as moot.

**ORDER**

For the reasons stated, the GT Defendants' Motion for Summary Judgment on Count III of Trustee's Second Amended Complaint [ECF No. 208] and Defendant Arlington Capital's Motion for Summary Judgment on Count III of the Trustee's Second Amended Complaint [ECF No. 212] are DENIED. Defendant Arlington Capital's Motion to Strike [ECF No. 225] and the GT Defendants' Motion to Strike [ECF No. 234] are GRANTED IN PART, DENIED IN PART and DENIED IN PART AS MOOT. Finally, the Plaintiff's Motion for an Order Striking or Summarily Denying Defendants' Motions Addressed to Count III [ECF No. 216] is DENIED AS MOOT.

SO ORDERED on May 17, 2012.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN

42

UNITED STATES DISTRICT COURT